BEURÉ–CO., a Minnesota Limited Partnership, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 129–86L.

United States Claims Court.

Dec. 5, 1988.

Thomas A. Larson, St. Paul, Minn., for plaintiff.

Susan V. Cook, with whom was Asst. Atty. Gen. Roger J. Marzulla, Washington, D.C., for defendant.

## OPINION

ANDEWELT, Judge.

This is a regulatory takings action. Plaintiff Beuré–Co.'s claim that its property was "taken" in violation of the fifth amendment is based on the Army Corps of Engineers' (Corps) denial of permits that would authorize plaintiff to add fill to and to construct a mini-warehouse on a tract of land owned by plaintiff in Eagan, Minnesota. The case is presently before the court on defendant's motion under RUSCC 12(b)(1) and 12(b)(4) to dismiss the complaint on the ground that plaintiff's takings claim is not ripe for judicial review. For the reasons set forth herein, defendant's motion is denied.

### Facts [1]

A. *The Preparation of Plaintiff's First Permit Application*

In 1970, plaintiff purchased for $30,000 approximately 25 acres of undeveloped wetland in the suburban community of Eagan, Minnesota. Shortly thereafter, plaintiff succeeded in having the site rezoned from "agricultural" to "light industrial" under the City of Eagan's Comprehensive Guide Plan. In 1977, the State of Minnesota condemned 11.66 acres of the site for nature trails, expansion of a state highway, and construction of a new bridge. The state paid plaintiff $67,000 in compensation. The remaining 13.01 acres (the 13–acre tract) are the subject of this suit.

The 13–acre tract is bisected by a spring-fed stream, Harnack Creek, which flows northerly into the Minnesota River—9.75 acres of the tract lie to the east of Harnack creek, and 3.26 acres lie to the west. Portions of the 13–acre tract are classified as "calcareous fen," a rare type of wetland that, because of its unusual chemical char-

---

1. The facts are derived from the Administrative Record and the pleadings.

acteristics, is conducive to the growth of certain rare species of plants.[2]

In September 1984, plaintiff entered into a purchase agreement for the sale of six acres of the 13–acre tract to Cedar Space Center, Inc. (Cedar) for $240,000. Cedar intended to construct a mini-warehouse storage facility on the land. Because the land was a wetland, Beuré–Co. would have to add fill to the land before construction could commence. Consistent with the purchase agreement, plaintiff sought local and state approval to add fill to the six-acre "Cedar site." In addition, plaintiff sought approval to fill the remaining seven acres of the 13–acre tract, which would be used for an unspecified light industrial purpose.

Initially, plaintiff was under the impression that federal approval was not required for the proposed development of its land. On November 29, 1984, however, the Corps notified plaintiff that a federal permit was required. The Corps took the position that the discharge of fill material onto the 13–acre tract required a permit from the Corps pursuant to Section 404 of the Clean Water Act (a Section 404 permit). *See* 33 U.S.C. § 1344.

The Corps initially did not specify whether plaintiff would require a "nationwide" or an "individual" permit from the Corps.[3] Plaintiff concluded that if it limited the proposed development to less than ten acres, it would require only a nationwide permit and would not have to undergo the more comprehensive review involved in securing an individual permit. *See* 33 C.F.R. § 330.5(a)(26). The Corps ultimately decided, however, that because the proposed fill might jeopardize Harnack Creek, a state-protected trout stream, an individual permit was required.

As a result of the Corps' actions, Cedar failed to fulfill the terms of the purchase agreement, and plaintiff was forced to cancel the agreement. Nevertheless, plaintiff decided to pursue the permit process with the State of Minnesota and the Corps. By the end of January 1985, plaintiff had secured approval for the proposed project from the Lower Minnesota River Watershed District and the Minnesota Department of Natural Resources (MDNR).

### B. Statutory and Regulatory Framework for Evaluating Section 404 Permit Applications

Section 10 of the Rivers and Harbors Act, 33 U.S.C. § 403, prohibits the unauthorized deposit of fill material into any "navigable water of the United States." *See* 33 C.F.R. § 320.2(b). Section 404 of the Clean Water Act, 33 U.S.C. § 1344, authorizes the Secretary of the Army, acting through the Chief of Engineers, to issue permits for the discharge of fill material into "waters of the United States," which has been defined in Corps regulations to include wetlands adjacent to waters of the United States. 33 C.F.R. §§ 320.2(f) and 328.3(a)(7). The policies and procedures governing the Corps' review of applications for such permits are set forth in 33 C.F.R. Parts 320, 323, and 325.

Pursuant to these regulations, the Corps evaluates permit applications under a public interest standard, which involves "an evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest." 33 C.F.R. § 320.4(a). In the evaluation analysis, the benefits which reasonably may be expected to accrue from a proposal are balanced against its reasonably foreseeable detriments. The standard that generally applies for evaluating permit applications is that "a permit will be granted unless the district engineer determines that it would be contrary to the public

---

**2.** A calcareous fen is a plant community that thrives on very wet soil having an internal flow of water that is rich in calcium and magnesium bicarbonates.

**3.** A "nationwide permit" is a form of general permit which serves to authorize activities throughout the nation and is designed to allow activities to occur with minimal delay and paperwork. *See* 33 C.F.R. § 330.1. In contrast, the "individual permit" procedure involves a case-by-case evaluation by the Corps of each proposed project in accordance with the procedures of 33 C.F.R. Parts 320, 323, and 325, which include public hearings and a determination of whether the proposed discharge is in the public interest. *See* 33 C.F.R. § 323.2(g).

interest." *Id.* Thus, under this standard, a permit would be granted if the district engineer concludes that the benefits and detriments of the proposal were equal.

The controlling regulations, however, demonstrate particular concern and employ a somewhat more restrictive standard for evaluating permit applications that involve alteration of important wetlands. The regulations state that "[m]ost wetlands constitute a productive and valuable public resource, the unnecessary alteration or destruction of which should be discouraged as contrary to the public interest." 33 C.F.R. § 320.4(b)(1). The regulations then proceed to identify the characteristics of those wetlands that should be "considered to perform functions important to the public interest." 33 C.F.R. § 320.4(b)(2). For permit applications that involve the alteration of such important wetlands, the controlling standard is that "[n]o permit will be granted ... unless the [Corps] concludes ... that the benefits of the proposed alteration outweigh the damage to the wetlands resource." 33 C.F.R. § 320.4(b)(4). Thus, under this standard, if the Corps concludes that the benefits of wetland development equal the detriments, the permit application must be denied.

The regulations also stress that in assessing the public interest in discharging fill onto a wetland, "the particular wetland site for which an application is made will be evaluated with the recognition that it may be part of a complete and interrelated wetland area." 33 C.F.R. § 320.4(b)(3). The reason is that "[a]lthough a particular alteration of a wetland may constitute a minor change, the cumulative effect of numerous piecemeal changes can result in a major impairment of wetland resources." *Id.*[4]

The Department of the Army regulations, in addition to establishing the specific standards outlined above, provide that any permit that involves a Section 404 discharge must be denied if the discharge would not comply with the Environmental Protection Agency's (EPA) Section 404(b)(1) guidelines. 33 C.F.R. § 320.4(a). These EPA guidelines are pertinent to the case at bar in three respects.

First, the EPA guidelines provide that with certain exceptions, not applicable here, "no discharge of ... fill material shall be permitted which will cause or contribute to significant degradation of the waters of the United States." 40 C.F.R. § 230.10(c).

Second, the EPA guidelines provide that with certain exceptions, also not applicable here, discharge of fill material will not be permitted "if there is a practicable alternative ... which would have less adverse impact on the aquatic ecosystem." 40 C.F.R. § 230.10(a). "An alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2). Practicable alternatives for the project may include the use of an alternative land site that is not presently owned by the applicant but could be reasonably obtained. *Id.* In assessing the existence of practicable alternatives, the regulations create a presumption that practicable alternatives exist in certain situations where the proposed development project is not dependent upon access or proximity to water.[5]

Third, the EPA guidelines provide that "no discharge of ... fill material shall be permitted unless appropriate and practicable steps have been taken which will minimize potential adverse impacts ... on the aquatic ecosystem." 40 C.F.R. § 230.10(d).

---

**4.** The same public interest standard, discussed above, that applies to important wetlands also applies to wetlands that would produce undesired cumulative effects. 30 C.F.R. § 320.4(b)(4).

**5.** 40 C.F.R. § 230.10(a)(3) provides:
Where the activity associated with a discharge which is proposed for a special aquatic

site [*e.g.,* a wetland] does not require access or proximity to or siting within the special aquatic site in question to fulfill its basic purpose (*i.e.,* is not "water dependent"), practicable alternatives that do not involve special aquatic sites are presumed to be available, unless clearly demonstrated otherwise.

With respect to the general issue of mitigation, the Corps regulations do not limit the Corps to either approving or disapproving a particular development project presented, but permit the Corps to condition the grant of a permit on specified modifications of the plan directed at mitigating adverse environmental effects. The regulations stress that "[m]itigation is an important aspect of the review and balancing process on many Department of the Army permit applications. Consideration of mitigation will occur throughout the permit application review process and includes avoiding, minimizing, rectifying, reducing, or compensating for resource losses." 33 C.F.R. § 320.4(r)(1).

The regulations provide the Corps with three types of mitigation options. First, the regulations encourage pre-application meetings between the Corps and prospective applicants and provide that as a result of these meetings, or anytime during the application process, "the district engineer may require minor project modifications," *i.e.,* modifications that "are considered feasible (cost, constructability, etc.) to the applicant and that, if adopted, will result in a project that generally meets the applicant's purpose and need." 33 C.F.R. § 320.4(r)(1)(i).

Second, the regulations provide, in effect, that the district engineer may require "[f]urther mitigation measures ... to satisfy legal requirements" such as those set forth in the EPA's Section 404(b)(1) guidelines. 33 C.F.R. § 320.4(r)(1)(ii).

Third, the regulations permit the Corps to require other changes in the project plans that "may be required as a result of the public interest review process." In this regard, the regulations stress that "[m]itigation should be developed and incorporated within the public interest review process to the extent that the mitigation is found by the district engineer to be reasonable and justified." 33 C.F.R. § 320.4(r)(1)(iii). The regulations limit the district engineer's authority to order changes in this third category to "those measures required to ensure that the project is not contrary to the public interest." *Id.*

## C. The Corps' Evaluation of Plaintiff's Section 404 Permit Applications

As anticipated by the regulations, plaintiff and the Corps engaged in mitigation discussions prior to plaintiff's filing of its permit application. During these discussions, the Corps representatives advised that plaintiff would improve its chances for approval of the permit if it reduced the scope of development from 13.01 acres to only the 9.75 acres east of Harnack Creek. On February 22, 1985, plaintiff filed an application seeking an individual permit that would authorize the filling of the 9.75-acre eastern tract and the construction of a mini-storage facility on 4.85 of the filled acres. The mitigative measures in the application included (1) reducing the scope of the plan by eliminating the 3.26 acres west of Harnack Creek, which were known to contain a very large portion of calcareous fen; (2) constructing an underground internal storm sewer system to carry ground water from the storage facility to a holding pond; and (3) designing a drainage system to facilitate drainage from the surface of the filled acreage.

After the permit application was filed, the Corps staff solicited additional mitigation proposals from plaintiff, but plaintiff refused to offer any. At a May 20, 1985, public hearing held on plaintiff's proposal, Mr. Luther M. Stalland, acting on behalf of Beuré–Co., rejected any additional mitigation and contended that he had already taken sufficient steps to alleviate the environmental impact of the proposed development and that "for the Corps to go beyond that and push [Beuré–Co.] further, makes the project not economically worthwhile."

On July 2, 1985, Stalland met with Corps employees for further discussions concerning the permit application. At that meeting, the Corps advised Stalland that additional threatened plant species had been identified on the property and that the calcareous fen was not limited to the previously known area on the 3.26–acre site west of Harnack Creek, but also had been discover-

ed on portions of the 9.75–acre proposed development site to the east.

During the course of the federal permit process, the MDNR expressed new concern about the threat to endangered plant species that would result from plaintiff's project. On September 26, 1985, the MDNR and plaintiff reached a tentative compromise pursuant to which plaintiff could go forward with the proposed project on the 9.75 acres east of Harnack Creek if plaintiff deeded to the MDNR the 3.26 acres west of Harnack Creek. The compromise agreement was conditioned on the Corps granting approval for the proposed development.

In an October 10, 1985, letter, the Corps denied plaintiff's permit application covering the 9.75–acre proposal. The letter from the district engineer summarized the basis for the Corps' decision as follows:

> We have concluded our review, and I have determined that issuance of the requested permit would be contrary to the public interest. In general, the benefits that the project might provide are outweighed by the detriments associated with the destruction of more than 9 acres of wetland. The project would provide little public benefit and would permanently deprive the public of a rare and valuable natural resource. Furthermore, the authorization of this wetland fill could set a precedent leading to the future destruction of other wetlands in the area. Finally, the project fails to comply with the U.S. Environmental Protection Agency's Section 404(b)(1) guidelines for the specification of disposal sites for dredged or fill material. The project fails to comply for two reasons: First, you have not rebutted the assumption that there are no practicable, less environmentally damaging alternatives to the proposed fill. Second, the project would result in the significant degradation of the aquatic ecosystem.

**6.** The regulation was later modified to permit the Corps in such circumstances to reach the merits of the public interest determination "after considering the likelihood of subsequent

Attached to the letter was a Statement of Findings of the District Engineer.

Thereafter, plaintiff notified the MDNR that in view of the Corps' decision, plaintiff would not grant the MDNR title to the 3.26 acres west of Harnack Creek. On November 25, 1985, the MDNR denied plaintiff's pending application to destroy endangered or threatened plants on the entire 13–acre tract, but indicated that the previously negotiated compromise remained acceptable.

Plaintiff did not file suit to challenge either the Corps' decision or that of the MDNR. *See, e.g., Loveladies Harbor, Inc. v. United States,* 15 Cl.Ct. 381, 384 (1988). On February 27, 1986, plaintiff filed this action alleging an unlawful taking of its property in violation of the fifth amendment. Thereafter, on April 3, 1986, plaintiff submitted to the Corps an application for a permit to fill the 3.26 acres west of Harnack Creek, which had not been a part of the first application. The Corps denied this second permit application, relying on 33 C.F.R. § 320.4(j)(1), which at that time provided:

> Final action on the Department of the Army permit will normally not be delayed pending action by another Federal, state, or local agency.... However, where the required ... state ... authorization ... has been denied for activities which also require a Department of Army permit before final action has been taken on the Army permit, the Army permit will be denied without prejudice to the right of the applicant to reinstate processing ... if subsequent approval is received from the ... state....[6]

The Corps concluded that under this regulation, it was obliged to deny the second permit without prejudice because the proposal to fill the 3.26 acres "could not be carried out without destroying the State-listed threatened plants known to exist at the project site."

Plaintiff was granted leave to amend its complaint in this action on three separate

[state] approval ... and the time and effort remaining to complete processing." 33 C.F.R. § 320.4(j)(1) (1987).

occasions.[7] In its third amended complaint, plaintiff attacks the Corps' denial of both the first and second permit applications and contends that "[a]ny development of the land required fill material to be placed upon the existing soil" and that "[d]efendant Corps in its decisions to assert jurisdiction and deny the plaintiff's permit application has deprived plaintiff of all economically viable use of its land."

Subsequently, defendant filed the instant motion to dismiss, which alleges that plaintiff's takings claim is not ripe for judicial review.

*Analysis*

I.

To prevail on a claim that governmental restrictions on land use constitute a taking in violation of the fifth amendment, a landowner must establish, first, "that the regulation has in substance 'taken' his property —that is, that the regulation 'goes too far,'" and, second, "that any proffered compensation is not 'just.'" *MacDonald, Sommer & Frates v. County of Yolo,* 477 U.S. 340, 348, 106 S.Ct. 2561, 2566, 91 L.Ed. 2d 285 (1986) (footnote and citations omitted). The analysis of regulatory takings claims involves an "essentially ad hoc, factual inquir[y]." *Id.* at 349, 106 S.Ct. at 2566. Factors of particular significance to the inquiry include "the economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the governmental action." *Id.* (quoting *Kaiser Aetna v. United States,* 444 U.S. 164, 175, 100 S.Ct. 383, 390, 62 L.Ed.2d 332 (1979)).

In the instant motion, defendant contends that plaintiff's takings claim is not ripe for judicial adjudication because the Corps has not yet decided the extent to which development of the land in issue will be permitted under the federal regulations, *i.e.,* has not yet decided how far the regulations go. Defendant contends that it is still possible for plaintiff profitably to develop its land in a manner consistent with the controlling statutes and regulations; that to date, the Corps has only denied one specific development proposal, and even that proposal may have been authorized had plaintiff offered additional mitigation. To support this argument, defendant relies primarily on the Supreme Court's decisions in *Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City,* 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed. 2d 126 (1985), and *MacDonald,* 477 U.S. 340, 106 S.Ct. 2561, which discuss the ripeness of fifth amendment takings claims that are predicated on an agency's denial of a proposed plan for land development.

II.

In *Williamson,* the Planning Commission of Williamson County, Tennessee, denied a particular land development plan because the plan failed to comply in a number of stated ways with the controlling zoning ordinance and subdivision regulations. The landowner had the option to respond to the denial by requesting that the Commission grant a variance from the zoning ordinance and regulations. The landowner chose instead, however, to bring a fifth amendment takings claim. At trial, the landowner prevailed; a jury agreed that a taking had occurred and awarded damages.

The Supreme Court set aside the jury verdict on the ground that the fifth amendment takings claim was not yet ripe for adjudication. The Court indicated that it was not in a position to evaluate either the

7. On May 14, 1986, plaintiff was granted leave to amend its complaint to include the Corps' denial without prejudice of plaintiff's application to fill the 3.26–acre parcel. On September 29, 1986, plaintiff was granted leave to file a second amended complaint in which it increased the alleged fair market value of the property from approximately $500,000 to approximately $1 million. On April 27, 1987, plaintiff was granted leave to file a third amended complaint. Therein, plaintiff dropped its previously advanced claims that the tract at issue was not subject to the Corps' jurisdiction and that the Corps' had abused its discretion in asserting such jurisdiction. In a proposed fourth amended complaint, plaintiff would add a damage claim for a "temporary taking" of its property during the pendency of these proceedings. In view of the disposition of defendant's motion to dismiss, plaintiff's motion to file its fourth amended complaint is hereby granted.

economic impact of the Commission's decision or the extent to which the decision interferes with reasonable investment-backed expectations until the Commission has reached "a final, definitive position regarding how it will apply the regulations at issue to the particular land in question." *Williamson*, 473 U.S. at 191, 105 S.Ct. at 3119. The Court found such a final, definitive position absent because the landowner could have sought variances, and such variances might have been granted. *Id.* at 193–94, 105 S.Ct. at 3120.

*MacDonald* involved a proposal by a landowner to subdivide a plot of land into 159 single-family and multifamily residential lots. The land, previously zoned for agricultural use, had been rezoned for residential use. The Commission of Yolo County, California, rejected the landowner's subdivision proposal and concluded that the proposal did not provide adequate public street access, sewer services, water supplies, and fire and police protection. The landowner subsequently filed a suit in California Superior Court alleging a regulatory taking.

In its complaint, the landowner charged that the County of Yolo restricted use of the land in question "to an open-space agricultural use by denying all permit applications, subdivision maps, and other requests to implement any other use," and thereby appropriated the "entire economic use" of the landowner's property "for the sole purpose of [providing] ... a public, open-space buffer." *MacDonald*, 477 U.S. at 344, 106 S.Ct. at 2564. The complaint also charged that in view of the Commission's decision concerning the adequacy of public access, sanitation services, water supplies, and fire and police protection, "none of the beneficial uses" allowed even for agricultural land would be suitable for the landowner's property. The complaint alleged, in capital letters, that "ANY APPLICATION FOR A ZONE CHANGE, VARIANCE OR OTHER RELIEF WOULD BE FUTILE." *Id.*

The County of Yolo demurred to the complaint and the demurrer was sustained by the trial court and the complaint dismissed. Both the California Court of Appeal and, ultimately, the Supreme Court, in a 5–4 decision, agreed that the demurrer was properly sustained.

In the Supreme Court, the majority and the four dissenters differed primarily with respect to the proper interpretation of the two lower-court *MacDonald* decisions. The dissent did not view the lower courts as having rejected as insufficient, under California pleading requirements, the complaint allegation to the effect that the landowner had been deprived of all beneficial use of its land. *Id.* at 356, 106 S.Ct. at 2570. Instead, the dissent believed that the Court of Appeal's decision was "most properly read as taking as true all of the allegations in the complaint, including the allegations of futility, and as rejecting those allegations as insufficient as a matter of substantive takings law." *Id.* at 363, 106 S.Ct. at 2574.

The dissent recognized that the Commission had only denied a single proposal that involved dividing the land into 159 residential lots, but stressed that an administrative agency's definitive position "may sometimes be determined by factors other than its actual decision on the issue in question." *Id.* at 359, 106 S.Ct. at 2572. The dissent noted that the complaint was not based only on the denial of a particular proposal, but also on the reasons given for the denial and on other actions by the Commission. The dissent concluded that "[a]lthough a landowner must pursue reasonably available avenues that might allow relief, it need not ... take patently fruitless measures." *Id.* Thus, according to the dissent, the plaintiff "sufficiently alleged a final decision denying it all reasonable economically beneficial use of its property." *Id.* at 360, 106 S.Ct. at 2572.

The majority did not specifically disagree with the proposition that an agency's definitive position may sometimes be determined from the denial of a single development proposal, and appeared to agree that the requirement of a "final, definitive" agency position does not require a landowner to make futile reapplications with an agency. *See Id.* at 353 n. 8, 106 S.Ct. at 2569 n. 8. But contrary to the dissent, the majority

interpreted the two lower-court decisions as not accepting as true the complaint allegations that the landowner was deprived of the entire economic use of its land and that future applications would have been futile. *Id.* at 352 n. 8, 106 S.Ct. at 2568–69 n. 8. The majority interpreted the lower-court decisions as holding that "there is no total prohibition against the productive use of [the] land." *Id.* It interpreted the trial level court as having concluded that even if the Commission's decision prohibited all industrial or residential use of the land, the land still might have value for use in agriculture. It interpreted the appellate court as concluding that even valuable residential development was open to the landowner. *Id.*[8]

Based apparently on the lower courts' statements to the effect that profitable development of the land had not been entirely precluded, the majority affirmed the dismissal of the complaint and concluded that the landowner did not yet receive the Commission's "final, definitive position regarding how it will apply the regulations at issue to the particular land in question." *Id.* at 351, 106 S.Ct. at 2568 (quoting *Williamson,* 473 U.S. at 191, 105 S.Ct. at 3199).

### III.

■ Neither *Williamson* nor *Mac-Donald* supports defendant's contention that the complaint herein should be dismissed pursuant to Rule 12(b)(4) for failing to state a claim upon which relief can be granted.

In evaluating a motion to dismiss for failure to state a claim, the general rule is that all factual allegations in a complaint (but not legal conclusions) are presumed to be true and all reasonable inferences are made in favor of the nonmoving party. 2A

J. Moore, J. Lucas & G. Grother, Jr., *Moore's Federal Practice* ¶ 12.07 [2.–5] at 12–63 (2d ed. 1987) (hereinafter *Moore's Federal Practice* ). As noted above, the complaint alleges, in pertinent part, that (1) "[a]ny development of the land required fill material to be placed on the existing soil," and (2) the Corps' "decisions to assert jurisdiction and deny the plaintiff's permit application has deprived plaintiff of all economically viable use of its land." At essence, these allegations are factual in nature and are not legal conclusions. If the allegations are presumed true, plaintiff's takings claim clearly would be ripe for judicial determination, *i.e.,* the agency decision would be final and definitive, in that the court would be in a position to undertake the necessary *ad hoc* factual inquiry into "the economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the governmental action." *Kaiser Aetna,* 444 U.S. at 175, 100 S.Ct. at 390.

*Williamson* does not suggest that these complaint allegations should not be presumed true. As summarized above, *Williamson* did not involve the issue of whether the complaint therein properly stated a claim upon which relief could be granted. In any event, in *Williamson,* the court found the claim not ripe because the landowner had not sought a variance from the Commission's prior ruling. Defendant has not pointed to any procedures in the Corps regulations that permit a landowner to seek either a variance or other analogous relief from a Corps decision.

*MacDonald,* however, is closer to the case at bar. As noted above, the *Mac-Donald* complaint contained an allegation that the landowner had been deprived of the "entire economic use" of its land, but the Supreme Court, applying California law, nevertheless upheld a demurrer to the

---

8. The majority stated:
   These holdings [of the lower courts] that there is no total prohibition against the productive use of [the] land cannot possibly be reconciled with the allegations in the complaint that 'any beneficial use' is precluded ... and that future applications would be futile.
   477 U.S. at 352 n. 8, 106 S.Ct. at 2568–69 n. 8. The Court indicated that in that context, the

lower court's rejection of the allegations in the complaint was consistent with "settled California demurrer law" under which properly pleaded factual allegations are deemed admitted but a "demurrer does not admit contentions, deductions, or conclusions of fact" in the complaint. *Id.*

complaint. That decision is potentially relevant here because a motion to dismiss under Rule 12(b)(4) for failure to state a claim upon which relief can be granted performs substantially the same function served at common law by the demurrer. *See Moore's Federal Practice,* ¶ 12.07 [2.–5] at 12–63.

But it is not necessary to explore the extent to which this court's interpretation of Rule 12(b)(4) may differ from the California courts' treatment of demurrers, because, in any event, unlike the lower courts in *MacDonald,* this court simply cannot conclude at this time that the Corps' decision denying the first permit application left open profitable use of the land.

First, the Corps' decision at least arguably can be interpreted to indicate an intention to deny any future Section 404 permit application that involves the discharge of fill material onto any part of the 13–acre wetland tract. For example, in the Statement of Findings, the Corps indicated, in effect, that not only was the calcareous fen portion of the 9.75–acre tract ecologically important, but so too was the rest of the tract both as a buffer to the calcareous fen and as an important wetland in its own right. Moreover, both the cover letter and the Statement of Findings express concern that authorizing the discharge of fill onto the land would set a precedent that might lead to the destruction of other wetlands in the area. Furthermore, the Corps did not suggest that any modifications in the development plan could shift the public interest evaluation under the Corps regulations in favor of development. Indeed, as noted above, the EPA Section 404 guidelines preclude the grant of a permit unless "appropriate and practicable steps have been taken which minimize potential adverse impacts ... on the aquatic ecosystem." While the Corps rejected the application for

failure to satisfy the EPA guidelines in other respects, it did not find a failure to minimize adverse impacts. Thus, it appears that the Corps believed that there were no "appropriate or practicable" mitigation steps that could cure the adverse ecological effects of plaintiff's development proposal.[9]

Second, even if the Corps' decision were not interpreted to indicate an intention to deny all future applications to add fill to any part of the 13–acre tract, the Corps' decision nevertheless could still have such a far-reaching effect. To understand the actual effect of an agency's rejection of a particular development proposal, it is sometimes necessary to place that decision in a broader factual context. As noted above, the reason a definitive agency position is a prerequisite to a takings claim is that to assess whether a taking has occurred, a court must be in a position to evaluate the economic impact of the regulation on the use of the land and its interference with reasonable investment-backed expectations. *Williamson,* 473 U.S. at 191, 105 S.Ct. at 3119. Sometimes an agency decision when viewed in isolation may not appear sufficient to permit an evaluation of these factors, but when viewed in a broader factual context the same decision may clearly be sufficient.

There are a number of such "broader" factual settings that potentially could support the contention that the Corps' actions deprived plaintiff of all economically viable use of its land, *i.e.,* that it would be futile for plaintiff to present to the Corps any additional development proposals for the 13–acre tract. For example, it is possible that the costs associated with adding fill and preparing the land for construction could render unprofitable any development proposal less intensive than the proposal

---

**9.** In *MacDonald,* the majority stressed that "[a] property owner is of course not required to resort to piecemeal litigation or otherwise unfair procedures in order to obtain [a] determination [of what use if any may be made of the affected property]." 477 U.S. at 350 n. 7, 106 S.Ct. at 2568 n. 7. To comply with this mandate, especially in situations where a takings claim is plausible, a regulatory agency that de-

nies a development plan should specify to the extent it reasonably can based on the information before it, the aspects of the plan that are inconsistent with the regulations and the changes that would be necessary to result in issuance of the permit, *i.e.,* specify the type of development that generally would be permitted consistent with the regulations.

contained in the first permit application. Plaintiff apparently was making such a contention when it informed the Corps that any additional mitigation would render the proposed development "not economically worthwhile."[10] The Corps' decision, however, would appear to preclude any development of the 13–acre tract that is more intensive than the proposal in the first application because more intensive development would have an even greater adverse impact on the aquatic ecosystem. If any more intensive plan would necessarily be rejected and any less intensive plan necessarily would not be economically viable,[11] then the Corps' decision, in effect, would preclude all economically viable industrial development of the land.

A different factual setting that could lead to the same conclusion arises from the Corps' discovery late in the permit process that there was a significant amount of calcareous fen on the 9.75 acres east of Harnack Creek. As explained above, the EPA Section 404(b)(1) guidelines prohibit any authorization to discharge fill onto wetlands where the result would be a "significant degradation of the waters of the United States." 40 C.F.R. § 230.10(c). The Corps' Statement of Findings appears to indicate that any significant destruction of calcareous fen would run afoul of this prohibition. It is possible that construction costs and/or the technological limits of existing construction techniques could make it impossible to fill and develop profitably any part of the 9.75 acres east of Harnack Creek without such destruction of the fen. If so, then the Corps' decision, in effect, would preclude all profitable industrial development of the land.

Next, as explained above, EPA's Section 404 guidelines also prohibit any discharge of fill onto wetlands where there are practicable alternative sites available for the development project. 40 C.F.R. § 230.10(a).

The record developed by the Corps suggests that there may be an abundance of undeveloped property in the Eagan vicinity that is not wetlands and is available for development. Notwithstanding that evidence, plaintiff sought to satisfy its burden (40 C.F.R. § 230.10(a)(3)) to demonstrate that there were no practicable alternative sites available for the mini-warehouse by presenting limited economic data relating to land prices. The Corps rejected the data as insufficient. In this context, if underlying economic factors dictate that practicable, nonwetland alternative sites exist for any otherwise permissible development of the 13–acre tract, then the Corps could not authorize such development and it would be futile for plaintiff to seek such authorization by making a reapplication to the Corps.

The complaint herein does not indicate whether plaintiff will rely upon one of the scenarios described above or some other to support its factual contention in the complaint that the Corps' actions have deprived plaintiff of all economically viable use of its land. But in this era of "notice pleading," a complaint can satisfy the requirement that it state a claim upon which relief can be granted without detailing the specific facts that support its more general allegations. *See, e.g., Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957).

In sum, the complaint properly states a claim. Unlike *MacDonald,* this court cannot conclude that the agency decision left open economically viable use of the land.

### IV.

Defendant makes a related ripeness argument that involves only plaintiff's second permit application which seeks authorization to fill the 3.26 acres west of Harnack Creek. Defendant contends that there is no final, definitive agency decision

---

**10.** Plaintiff had previously sought alternative purchasers for other types of limited development but could find none.

**11.** The ripeness requirement should not oblige a landowner to seek a permit for a development proposal that it does not deem economically viable and, hence, does not intend to undertake.

To the extent that the government disagrees with the landowner's conclusion as to the economic viability of development proposals left open by an agency decision, it can present its arguments to the court considering the merits of the taking claim.

as to that parcel because pursuant to its regulations, the Corps never evaluated the second application on its merits. As noted above, the Corps denied the second application without prejudice, based on the State of Minnesota's previous denial of a permit to destroy endangered plants on the 13-acre tract.

But the ultimate merits of the first and second applications are obviously interrelated. A request for authorization to fill the 3.26-acre tract was excluded from the first application because during pre-filing mitigation negotiations, Corps representatives indicated that proposing to fill that tract, which is rich in calcareous fen, would decrease the likelihood that a permit would be allowed. Moreover, much of the discussion as to the reach of the statutes and regulations in the Corps' decision on the first application would necessarily apply to the contiguous 3.26 acres west of Harnack Creek, which is part of the same general wetland area and which contains an even larger calcareous fen area than the 9.75 acres east of Harnack Creek.

Plaintiff made an application for a permit to fill the 3.26 acres and it was denied. As noted above, the ripeness doctrine does not require a landowner to make futile reapplications to administrative agencies. Plaintiff contends, and the complaint can be read, in effect, to allege that the Corps' interpretation of the controlling federal statutes and regulations to date precludes all beneficial use of the 3.26-acre tract. Plaintiff may or may not ultimately be able to prove this allegation. But for the same basic reasons discussed in IV, *supra*, it is not apparent that the agency's interpretation of the relevant statutes and regulations leaves open profitable development of the 3.26-acre tract. Plaintiff's contention in the complaint to the effect that the decisions do not permit profitable development is sufficient to state a claim and thereby survive the attack under Rule 12(b)(4).[12]

## V.

Defendant's motion under Rule 12(b)(1) addresses the subject matter jurisdiction of this court. Defendant does not dispute that this court has jurisdiction to consider takings claims based on the Corps' denial of a Section 404 permit. *See, e.g., Lovela-dies*, 15 Cl.Ct. at 385–87. Defendant contends, however, that this court lacks subject matter jurisdiction in this case because the takings claim is not yet ripe. When applying Rule 12(b)(1), unlike Rule 12(b)(4), this court need not assume that all factual allegations in the complaint are true. The court may review any evidence, including affidavits and testimony, to resolve factual disputes concerning the court's jurisdiction to hear this action. *See, e.g., Land v. Dollar*, 330 U.S. 731, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947). The evidence submitted to date consists primarily of the Administrative Record which is reviewed in part in the statement of facts above.

As explained in III, *supra*, the Corps' decision, when viewed in isolation or in certain possible broader factual settings, can be interpreted to support the complaint allegation that the Corps has deprived plaintiff of all economically beneficial use of its land. Upon review, the evidence submitted to date simply does not negate such an interpretation. It does not itself indicate that profitable development of the land was left open to plaintiff.

It is possible that additional facts may ultimately demonstrate that the Corps' decision has not deprived plaintiff of all beneficial use of its land. Therefore, one option would be for this court to hold a factual hearing to explore the jurisdictional issue more fully. But the jurisdictional facts in this action appear to be inextricably intertwined with the merits of the takings claim. Evaluation of each necessitates a detailed factual inquiry into the economic impact of the Corps' actions on plaintiff's ability to profit from its land. When the issue of jurisdiction is so inter-

---

12. The existence of Minnesota state regulations that also prevent development of the land could impact the ultimate decision on the merits as to the existence and extent of federal liability. But the presence of such regulations, which are not mentioned in the pleadings should not render a complaint that otherwise properly states a claim vulnerable to attack under Rule 12(b)(4).

twined with the merits of a claim, the preferred procedure is to assume that jurisdiction exists and to proceed with consideration of the merits of the claim, where appropriate, using summary judgment procedures. *See* 2A *Moore's Federal Practice,* ¶ 12.07 [2.–1], at 12–50. That procedure is adopted here.[13] Consequently, defendant's motion to dismiss under Rule 12(b)(1) is denied.

### Conclusion

For the reasons set forth above, defendant's motion to dismiss filed pursuant to Rule 12(b)(1) and 12(b)(4) is denied.

IT IS SO ORDERED.

---

**13.** If defendant believes that it can demonstrate that substantial efficiencies would result if the jurisdictional issue were resolved separate from the merits of the takings claim, it may seek reconsideration of this decision. Any such motion for reconsideration should detail the facts defendant intends to prove to demonstrate that the Corps' decision has left open economically viable use of plaintiff's land, the evidence defendant will rely upon, and the reasons why it would be more efficient to resolve any disputed factual issues relating to jurisdiction in advance of consideration of the merits of the takings claim.