**Ray FORMANEK and Ruth Lounsberry, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 764–86L.**

United States Claims Court.

Nov. 16, 1989.

Robert L. Schnell, Jr., Minneapolis, Minn., for plaintiffs.

Susan V. Cook, Washington, D.C., with whom was D. Lee Toedter, of counsel, St. Paul, Minn., for defendant.

## OPINION

ROBINSON, Judge.

This case is before the court on defendant's motion to dismiss or for summary judgment and on plaintiffs' cross-motion for partial summary judgment. Plaintiffs claim that the U.S. Army Corps of Engineers' (Corps) denial of their Clean Water Act § 404 permit application to discharge fill material onto their 112–acre tract in Savage, Minnesota, containing approximately 100 acres of wetlands, constitutes a taking under the fifth amendment. Defendant argues in its motion to dismiss that the claim is not ripe for judicial review because the Corps denied only one possible use of the property, or that the claim is only partially ripe as the permit application addresses only 11 acres of the 112–acre

site. Defendant contends alternatively in its motion for summary judgment that there has been no taking because plaintiffs have admitted that their property has a substantial "fair market value" for their property. Plaintiffs maintain in their motion for partial summary judgment that the undisputed facts compel the conclusion that the Corps' actions have deprived them of all economic uses of their property. They urge the court to proceed immediately to a determination of damages.

For the reasons set out below, this court must deny both parties' motions. The court will require by later order further proceedings consistent with this opinion.

### FACTS [1]

In 1959, plaintiffs purchased approximately 112 acres of undeveloped land in Savage, Minnesota for $200 to $300 per acre. The property is composed of approximately 100 acres of wetlands with pockets of upland amounting to an additional 12 acres in two corners of the parcel. This land lies in the Lower Minnesota River Valley in the Minneapolis–St. Paul, Minnesota greater metropolitan area and is part of a 186–acre area known commonly as the Savage Fen wetland complex. The Savage Fen contains a rare, ecologically significant calcareous fen plant community. A calcareous fen is an area of saturated or inundated peat with a high concentration of calcium carbonates in the soil and water. These unusual nutrients support plant communities that are not found under other conditions. The peat deposits on plaintiffs' property range in depth from one foot to 40 feet. Further, important geologic and subsurface organic formations in the complex filter and cleanse a perennial headwater stream draining the Fen as it flows toward the Minnesota River. The complex is considered to be a water of the United States because it is adjacent to both an unnamed tributary to the Minnesota River and the Minnesota River. *See generally* 33 C.F.R. 323.2(a)(7).

The general area in which plaintiffs' property is located has been zoned for in-

dustrial use since at least 1962. The City of Savage designated the area as an industrial park in 1973 and there exists currently a variety of industrial development. In June 1984, the city commenced a public works project in the park that included construction of public water, sewer, and storm sewer facilities. The city assessed owners of property within the park for the utility improvements.

On November 29, 1983, the Corps exerted discretionary authority to override the nationwide permit requirement that applied to a 40–acre portion of the Savage Fen, because the area was zoned for industrial use, and development of the Fen appeared likely. A "nationwide permit" is a form of general or blanket permit which serves to authorize discharge or fill activities throughout the nation and is designed to allow those activities to occur with minimal delay and paperwork. *See* 33 C.F.R. § 330.1. As a result of the Corps' exercise of authority, any development project involving the placement of dredged or fill material on the 40 acres would require an "individual permit". The "individual permit" procedure is more restrictive than the "nationwide permit" process and demands that the Corps evaluate each proposed project on a case-by-case basis in accordance with 33 C.F.R. Parts 320, 323, and 325, which provide for a public hearing and a determination of whether the proposed discharge is in the public interest. *See* 33 C.F.R. § 323.2(g).

After the Corps conducted an environmental inspection and assessment on plaintiffs' property which revealed several plant species protected by the State of Minnesota, and revealed 24 additional acres of calcareous fen, the Corps, on March 4, 1985, issued a public notice extending its discretionary authority over 146 more acres of the Savage Fen wetland complex. All of the wetland within plaintiffs' property were now included in the 186 total acres of the Savage Fen wetland complex under the Corps' jurisdiction. Thus, the individual permit requirements of 33 C.F.R. Parts

**1.** The facts are derived from the Administrative  Record (A.R.) and the pleadings.

320, 323, and 325 applied to plaintiffs' property.

On October 9, 1985, plaintiffs filed a § 404 permit (33 U.S.C. § 1344) application with the U.S. Army Corps of Engineers to place fill material on the property to build an access road. This access road would allow plaintiffs to show, market, and sell seventeen or eighteen separate tracts to prospective developers. Plaintiffs included with their application a concept sketch and preliminary grading plan indicating the alignment of the proposed road. The plat showed also the subdivision of the parcel and the alignment of a second access road.

Representatives from the Corps and the U.S. Environmental Protection Agency (EPA) met informally on January 17, 1986, to review the plaintiffs' permit application. They agreed that the likely adverse impacts of plaintiffs' proposal were such that the application should be denied without further processing. A.R. 41. As required by the individual permit regulations, however, the Corps conducted a full public interest review between February 10 and March 12, 1986.

### Regulatory and Statutory Standards and Criteria for Evaluating 404 Permit Applications

Pursuant to Section 10 of the Rivers and Harbors Act, 33 U.S.C. § 403, and Section 404 of the Clean Water Act, 33 U.S.C. § 1344, the U.S. Army Corps of Engineers evaluates § 404 permit applications under a public interest standard. This standard, embodied in 33 C.F.R. § 320.4(a), requires an evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest. A balancing test is used to weigh the benefits and detriments that might be reasonably expected to accrue from a proposal. The applicable standard is: "[A] permit will be granted unless the district engineer determines that it would be contrary to the public interest." *Id.*

Important wetlands, however, are subject to heightened scrutiny and are evaluated under a more discerning standard. The regulations state that "[m]ost wetlands constitute a productive and valuable public resource, the unnecessary alteration or destruction of which should be discouraged as contrary to the public interest." 33 C.F.R. § 320.4(b)(4). This standard requires that if detriments equal benefits, the permit application must be denied. The regulations stress that a particular wetland "will be evaluated with the recognition that it may be part of a complete and interrelated wetland area." 33 C.F.R. § 320.4(b)(3). Further, the regulations state that "[a]lthough a particular alteration of a wetland may constitute a minor change, the cumulative effect of numerous piecemeal changes can result in a major impairment of wetland resources." *Id.*

The Corps of Engineers must also enforce EPA's § 404(b)(1) rules and guidelines. 33 C.F.R. § 320.4(a). These guidelines provide that discharge of fill material will not be permitted "if there is a practicable alternative ... which would have less adverse impact on the aquatic ecosystem." 40 C.F.R. § 230.10(a). And, "an alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2). Use of an alternative tract of land not presently owned by the applicant is among commonly considered, practicable alternatives.

A key component of evaluating a practicable alternative is whether or not the proposed development is water dependent, i.e., requires access to water.[2] If the proposed development is not water dependent, the applicant will have the burden of showing there are no practicable alternatives.

In addition, the guidelines state that "no ... fill material shall be permitted unless appropriate and practicable steps have

---

**2.** 40 C.F.R. § 230.10(a)(3) states in part:
Where the activity associated with a discharge (e.g, filling) which is proposed for a special aquatic site (e.g. wetland) does not require access or proximity to or siting within the special aquatic site in question to fulfill its basic purpose, practicable alternatives that do not involve special aquatic sites are presumed to be available, unless clearly demonstrated otherwise.

been taken which will minimize potential adverse impacts ... on the aquatic ecosystem." 40 C.F.R. § 230.10(d). This guideline raises the issue of mitigation. The Corps may either approve or disapprove an application; condition it subject to the guidelines and approval of another agency; or, grant it upon specified modifications to the applicant's application. The last of these four options is encouraged in the regulations. *See* 33 C.F.R. § 320.4(r) *et seq.*

The regulations encourage preapplication meetings in which "the district engineer may require minor project modification(s)," which are "considered feasible (cost, constructability, etc.) to the applicant and that, if adopted, will result in a project that generally meets the applicant's purpose and need." *Id.* These mitigation meetings are to occur, not only before the application is submitted, but throughout the application review. The district engineer may also require mitigation measures "to satisfy legal requirements" such as those set forth by the EPA, and "as a result of the public interest review process." *Id.*

### The Corps' Evaluation of the Applicant's 404 Permit Application

There is no evidence in the administrative record that either party offered any mitigation regarding the proposed project. Instead, on June 25, 1986, following the public notice and comment period, Colonel Joseph Briggs, District Engineer of the U.S. Army Corps of Engineers, determined that plaintiffs' proposed development was not in the public interest. Relying on the environmental assessment of the project and the public's comments generated during the review process, the District Engineer found: (1) the proposed discharge of fill material would result in the direct loss of approximately 11 acres of high-quality wetland and the degradation of an additional six acres; (2) the loss of the wetland would contribute to the disappearance of unique calcareous fen, low prairie plant communities, and rare, threatened, or endangered plant species; (3) the project would displace wildlife inhabiting the site;

and (4) the proposed discharge would destroy the important water quality functions that the wetland performs. The District Engineer denied accordingly plaintiffs' § 404 permit application.

Plaintiffs chose not to challenge the validity of the permit denial in federal district court. *See, e.g., 1902 Atlantic v. Hudson,* 574 F.Supp. 1381 (E.D.Va.1983). Rather, plaintiffs filed this action seeking compensation for the allegedly unlawful taking of their property in violation of the fifth amendment.

### DISCUSSION

In its motion to dismiss, defendant presents two theories: 1) the claim is not ripe because the Corps denied just the single possible use of the property addressed in plaintiffs' § 404 permit application, rather than all uses of the property; and 2) in the alternative, the claim is at most partially ripe since the Corps denied a permit application covering only approximately 11 acres of the 112–acre parcel. Defendant maintains that the decision denying the single § 404 permit application in this case does not constitute a "final and authoritative determination of the type and intensity of development legally permitted on the subject property." *MacDonald, Sommers & Frates v. Yolo County,* 477 U.S. 340, 349, 106 S.Ct. 2561, 2566, 91 L.Ed.2d 285 (1986). According to defendant, plaintiffs' failure "to modify the scope of the proposed project[,] despite the fact that it became abundantly clear during the course of the permit application process that the portion of the property covered by the rare calcareous fen, considered to be an irreplaceable natural resource, was particularly sensitive" is equivalent to "the failure of a developer to seek variances which was found to render litigation premature in *Williamson County Regional Planning Comm'n v. Hamilton Bank,* 473 U.S. 172 [105 S.Ct. 3108, 87 L.Ed.2d 126] (1985)."

Defendant asserts that the Corps' denial of plaintiffs' application does not mean further applications would be futile, and does not foreclose development of the property.

Based upon its own characterization of the Corps' decision, defendant concludes that the court is unable to make the ad hoc inquiry into the economic impact of the regulation on the plaintiffs and the extent to which the regulation has interfered with plaintiffs' distinct investment-backed expectations. *See MacDonald,* 477 U.S. 340, 106 S.Ct. 2561, 91 L.Ed.2d 285 (1986). Finally, defendant argues that even if plaintiffs' claim is ripe, the court may consider only allegations regarding a small fraction of the property—the approximately 11 acres indicated on the development proposal plat as the roadbed onto which plaintiffs would initially place fill material. Relying on *Florida Rock Industries, Inc. v. United States,* 791 F.2d 893 (Fed.Cir.1986), *cert. denied,* 479 U.S. 1053, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987), defendant contends that since plaintiffs have been denied a permit affecting a mere sliver of their property, their claimed taking of all viable economic use of the other, contiguous portions of the property is not ripe.

## I.

■ Defendant advanced—and the Claims Court rejected—a ripeness defense in two recent, factually similar cases: *Loveladies Harbor, Inc. v. United States,* 15 Cl.Ct. 381 (1988), and *Beure-Co. v. United States,* 16 Cl.Ct. 42 (1988). In *Loveladies Harbor,* plaintiffs sought from the Army Corps of Engineers in 1981 a permit to fill 12.5 acres of a 51-acre wetland complex in order to construct houses. The Corps reduced the permit request to 11.5 acres after it discovered that one of the acres was upland, over which the Corps had no § 404 jurisdiction. The Corps ultimately denied plaintiffs' application because of the government's desire to preserve the wetland along with the attendant wildlife and vegetation. After plaintiffs' challenge to the validity of the permit denial failed in federal district court, plaintiffs sued in the Claims Court, alleging a fifth amendment taking of their property.

Defendant argued that the court lacked jurisdiction because plaintiffs' action was not ripe. While defendant conceded that plaintiffs had met certain requirements by submitting an application to the Corps, *see Agins v. Tiburon,* 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980); *Burlington N.R.R. Co. v. United States,* 752 F.2d 627 (Fed.Cir.1985), defendant contended that *MacDonald,* 477 U.S. 340, 106 S.Ct. 2561, 91 L.Ed.2d 285 (1986), and *Williamson,* 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985), compelled plaintiffs to file alternative applications containing less ambitious proposals and to seek at least one variance. The Claims Court (Smith, C.J.) determined, however, that neither *MacDonald* nor *Williamson* applied, because each was distinguishable in important aspects.

In *MacDonald,* a county planning commission denied a permit request for housing development based on four specific objections. The Supreme Court found that the "rejection of exceedingly grandiose development plans does not logically imply that less ambitious plans will receive similarly unfavorable reviews." *MacDonald,* 477 U.S. 340, 353, n. 9, 106 S.Ct. 2561, 2568 n. 9, 91 L.Ed.2d 285. Thus, the Supreme Court decided the action was not ripe because there was no way of determining the county's position if the four deficiencies were corrected. The Claims Court interpreted the Supreme Court's opinion as holding that Yolo County "did not reject the housing plan because housing construction was unacceptable per se, but rather because the plan was lacking in certain limited respects." *Loveladies Harbor,* 15 Cl.Ct. 381, 385.

In *Loveladies,* the Claims Court concluded, in contrast to the finding in *MacDonald,* that because the Corps' objections to the § 404 permit application were based upon environmental concerns, and any plan for development of the 11.5 acres would destroy the wetland, the Corps' denial rendered housing development on the 11.5 acres unacceptable per se. In addition, the court noted that the Corps had failed wholly to provide any alternative for development. Thus, the court held that the Corps' denial of Loveladies Harbor, Inc.'s § 404 permit application presented a ripe, final, definitive, governmental position as required by *MacDonald. Id.* at 386.

The Claims Court also declined to extend the variance requirement of *Williamson* to cases presenting federal takings claims. The court determined that the *Williamson* progeny have been limited to situations involving alleged violations by local zoning commissions because variances are a feature commonly provided by state and local zoning enabling acts. *Loveladies,* 15 Cl.Ct. at 387. The court found that a variance procedure or some similar alternative that would obviate litigation does not exist under the Water Pollution Prevention and Control Act and its related regulations. Thus, the court decided that the pursuit of a variance would be futile, and that plaintiffs' claim was ripe. *Id.*

In *Beure-Co.,* the Claims Court (Andewelt, J.) again analyzed *MacDonald* and *Williamson* in the context of defendant's motion under RUSCC 12(b)(1) and 12(b)(4) to dismiss plaintiff's fifth amendment taking claim on the ground that plaintiff's claim was not ripe. Plaintiff had sought from the Corps a permit to fill a tract, portions of which are classified as calcareous fen. During the pre-application process, the Corps informed plaintiff that it could improve its chances of obtaining a permit if it reduced the scope of its development from 13 acres—the total tract acreage—to 9.75 acres. Plaintiff adopted the Corps' advice, and submitted an application limited to 9.75 acres. The application also included two proposals for drainage systems. Plaintiffs rejected all of the Corps' further suggestions of mitigation.

The Corps denied plaintiff's permit application for the 9.75–acre proposal. The Corps stated: "In general, the benefits that the project might provide are outweighed by the detriments associated with the destruction of more than 9 acres of wetland.... Furthermore, the authorization of this wetland fill could set a precedent leading to the future destruction of other wetlands [sic] in the area." *Beure-Co.,* 16 Cl.Ct. at 46. After this denial, plaintiff filed with the Corps a permit application covering the 3.26 acres which had not been included in the first application. The Corps denied the second application without prejudice because the state had

withheld the requisite authorization. Plaintiff then filed suit in the Claims Court alleging that "[a]ny development of the land required fill material to be placed upon the existing soil" and that "[d]efendant Corps in its decisions to assert jurisdiction and deny the plaintiff's permit application has deprived plaintiff of all economically viable use of its land." *Id.* at 47.

Defendant moved to dismiss, contending that the takings claim was not ripe because the Corps had not decided the extent to which development of the 13 acres would be permitted under federal regulations. Defendant asserted that plaintiff could profitably develop its land in a manner consistent with the controlling statutes and regulations. In addition, defendant argued that the Corps had denied only one specific proposal, and that proposal may have been authorized had plaintiff offered additional mitigation. Thus, defendant concluded that the court could not entertain plaintiff's fifth amendment takings claim predicated on the Corps' denial of a single land development proposal.

The Claims Court held that neither *Williamson* nor *MacDonald* supported defendant's position that plaintiff had failed to state a claim upon which the court could grant relief. *Id.* at 49. The court noted that the complaint alleged that (1) "[a]ny development of the land required fill material to be placed on the existing soil," and (2) the Corps' "decision to assert jurisdiction and deny the plaintiff's permit application has deprived plaintiff of all economically viable use of its land." The court determined that these allegations were factual in nature, and concluded that if the allegations were presumed true, the takings claim was clearly ripe. *Id.*

Because the court was not aware of any procedures in the Corps' regulations permitting a landowner to seek either a variance or other analogous relief from a Corps decision, the court decided that *Williamson* was inapplicable. And though the court believed *MacDonald* was closer to the facts presented by Beure-Co., Inc.'s claim, the court nevertheless determined that it could not conclude "that the Corps'

decision denying the first permit application left open profitable use of the land." *Id.* at 50. The court reasoned that the Corps' decision could "arguably be interpreted to indicate an intention to deny any further Section 404 permit application that involves the discharge of fill material onto any part of the 13–acre wetland tract." *Id.* Since the Corps did not suggest that any modifications in the development plan could shift the public interest evaluations under the Corps regulations in favor of development, the court assumed that the Corps believed that there were no "appropriate or practicable" mitigation steps that could cure the adverse ecological effects of plaintiff's development proposal. *Id.*

Further, the court indicated that even if the Corps' decision were not interpreted to indicate an intention to deny all future application to add fill to the tract, "the Corps' decision could still have such a far-reaching effect." *Id.* Thus, the court stated that an agency decision, which when considered in isolation may not appear sufficiently ripe, may nonetheless be sufficient for judicial review when examined in a broader factual context. *Id.* The court discussed a number of such broader factual settings that could support potentially the contention that additional development proposals would be futile. Though the court was aware that plaintiff's complaint did not detail the specific facts that supported the general allegations, the court concluded that the complaint properly met "notice pleading" requirements, *citing Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957), and stated a ripe claim. *Id.* at 51.

Likewise, the court determined that it had subject matter jurisdiction to consider plaintiff's claim, despite defendant's contention that the claim was not ripe. In evaluating the defendant's Rule 12(b)(1) motion to dismiss, the court recognized that it did not have to assume that all factual allegations in the complaint were true. Rather, the court determined that it was able to review any evidence, including affidavits and testimony, to resolve factual disputes concerning the court's jurisdiction. *Id.* at 52, *citing Land v. Dollar*, 330 U.S.

731, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947). However, the court decided that the evidence that had been submitted simply did not negate an interpretation of the complaint, based upon numerous possible factual settings, that the Corps had deprived plaintiff of all economically beneficial use of its land. *Id.* Thus, the court denied provisionally defendant's Rule 12(b)(1) motion. The court did acknowledge that "additional facts may ultimately demonstrate that the Corps' decision has not deprived plaintiff of all beneficial use of its land." *Id.* However, since the court found that the jurisdictional facts were so "inextricably intertwined with the merits of the takings claim," it believed that the preferred procedure was to assume jurisdiction existed and to proceed with the merits of the claim. *Id.* at 52–53.

This court cannot ignore the thorough, persuasive analysis of the ripeness defense contained in *Loveladies* and *Beure-Co.* In this case, defendant simply has not discussed adequately the concept of a "final and authoritative determination" as applied to the facts presented in the administrative record. Nor has defendant proffered any example of what it would consider to be a "final and authoritative determination" within the context of this case. Further, defendant fails wholly to support by specific reference to the record its assertion that the Corps' denial of plaintiffs' application does not mean further applications would be futile, and does not foreclose development of the property. Defendant has merely suggested that plaintiffs need to file an indeterminable number of additional permit applications. In addition, defendant's attempts to distinguish *Beure-Co.* are patently insufficient. Defendant claims only that the administrative record on which the *Beure-Co.* court based its opinion is significantly different than the record here. While the court agrees, of course, that the records in *Beure-Co.* and the case at bar are necessarily unique, the court remains unconvinced that there exists presently any well-supported basis to determine that plaintiffs' claim is not ripe.

In their complaint, plaintiffs allege:

In denying the Section 404 permit, the Corps of Engineers made it clear that the only use which would be permitted to plaintiff on his property would be for plaintiff to keep the property in its "undeveloped, natural condition." Thus, the defendant has taken plaintiff's property for public use by requiring that the property be held as a nature preserve, with no use or development permitted, while plaintiff continues to pay taxes and other costs associated with owning the property. Plaintiff has thus been denied the reasonable beneficial use and enjoyment of his property.

As determined by the *Beure-Co.* court, allegations such as those plaintiffs now plead are factual in nature. *Beure-Co.*, 16 Cl.Ct. at 49. Thus, if this court presumes that plaintiffs' allegations are true—as it must—plaintiffs' fifth amendment claim is ripe. *Id.*

The court believes that a further examination of the administrative record in this case reveals several stronger factors than those in *Beure-Co.* for holding that the takings claims is ripe. The Corps had available to it four permit action alternatives: (1) issuance of the permit as requested; (2) issuance of the permit with modifications; (3) issuance of the permit with special conditions and/or mitigation requirements; or, (4) denial of the permit. A.R. 125. The District Engineer determined that he had to deny the permit as requested because he found that approval of the permit was contrary to the public interest. In his findings, the District Engineer stated: "In this case, the issue is the protection of this rare and valuable wetland and I find that outweighs the public benefits that the project might provide, as well as the private financial benefits that might accrue to the applicant if the road is allowed to be constructed in the wetland." A.R. 126. He stated further: "This proposal would completely destroy approximately 11 acres of the Savage Fen wetland complex. The rarity and importance of the nation's calcareous fens is documented in the ... environmental assessment. The destruction of this rare wetland represents a significant degradation of the aquatic eco-

system, and the permit must be denied." *Id.*

Because the Corps chose to deny outright the permit application, rather than opting for some other alternative available to it, and because the Corps did not suggest *any* mitigation, as it did in *Beure-Co.*, it is reasonable for this court to assume, based upon *Beure-Co.*, that the Corps believes there are no appropriate or practicable efforts that plaintiffs can take to obtain approval of their permit application. Certainly, the language of the Corps' decision can be interpreted as foreclosing development on any part of the wetland complex.

Defendant argues also that plaintiffs have failed to clearly demonstrate that practicable upland alternatives are not available. *See* 40 C.F.R. § 230.10(a). However, the Corps' decision acknowledges that "the upland alternative may not be economically feasible for the applicant." A.R. 124. In addition, defendant claims that plaintiffs did not show that some other, less environmentally damaging access to the site would not also constitute a practicable alternative. Yet, the Corps did not offer suggestions regarding the alignment of the proposed road or the scope of the development. In each instance, the court can interpret easily plaintiffs' silence or lack of action on these issues as plaintiffs' assertion that any such alternatives would render the proposed development economically infeasible.

Plaintiffs' allegation that the Corps' denial of their § 404 permit application forecloses profitable development of their land states a claim. No evidence that the defendant has submitted with its motion to dismiss compels a contrary conclusion. Therefore, the court deems plaintiffs' claim ripe and must deny the motion to dismiss based on the ripeness defense.

## II.

█ Defendant contends that even if plaintiffs' complaint states a ripe claim, the court should nonetheless dismiss the complaint in part because the denial of the Clean Water Act § 404 permit application

was for only a small fraction of the property. Defendant asserts that plaintiffs' theory is that because they were denied a permit for a project on 11 acres, they were denied the beneficial enjoyment of all 112 acres—including over 11 acres of upland. Comparing plaintiffs in this case to the claimants in *Florida Rock Industries, Inc. v. United States*, 791 F.2d 893 (Fed.Cir. 1986), *cert. denied* 479 U.S. 1053, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987), defendant argues that since a permit has been denied for only a portion of the property, any claimed taking of all viable economic use of the other portions of the property is not ripe for review. Defendant believes that any argument for a taking of all beneficial uses of the whole tract is simply too speculative. Thus, defendant concludes that plaintiffs' claim is not ripe to the extent that plaintiffs seek compensation for the entire parcel. The court determines, however, that the Corps' decision—the basis for plaintiffs' taking suit—undermines the logic of defendant's proposition that the court must limit its consideration of plaintiffs' claim to just 11 acres. Further, the court finds that *Florida Rock* is factually distinguishable.

Plaintiffs' application for a § 404 permit proposed "filling—road grading of access road as depicted on the ... preliminary concept plan." The stated purpose of this proposed activity was "to build an access road onto the site for site marketing." The concept sketch and preliminary grading plan which plaintiffs submitted with their application clearly contemplated extensive development of the 112–acre parcel. The plat provided for 18 lots serviced by two access roads. Plaintiffs indicated that they wished to commence development of their property immediately. A.R. 4.

Defendant's counsel has acknowledged that incomplete plans are not unusual. She stated: "The application itself merely—generally what happens is with an application, the applicant will submit a rather rough plans. [sic] After the application is approved he'll come back with what they call final plans." Transcript of oral argument at p. 13, 11. 20–23, *Formanek v.*

*United States*, Cl.Ct. No. 764–86L (filed February 22, 1989). Thus, the plaintiffs' § 404 permit application seeking permission to fill the area for the proposed access road could be considered only the initial stage of a comprehensive project. Yet, because the Corps flatly rejected plaintiffs' "rough plans" for the access road onto the site—an essential element of the project— plaintiffs did not have the opportunity to present their further development plans incorporating that same access road. Indeed, the Corps' decision provided no encouragement to plaintiffs regarding any commercial use of their property. While the District Engineer recognized that "the area is zoned for industrial development," he indicated that "significant issues of national importance," such as the protection of rare wetland, may "override existing zoning determinations." A.R. 126. Further, the Corps' decision suggested that the only practicable alternative use of the project site might be the sale of the entire parcel in an undeveloped, natural condition. A.R. 124.

Plaintiffs did not specify in their § 404 permit application or their concept plan the amount of acreage which they sought to fill. Rather, from an illustration of the proposed access road, the Corps estimated that the roadway covered 11 acres of the parcel. Defendant seeks to limit plaintiffs' claim to this acreage, because "the Corps only has the authority to consider the development proposal before it." Transcript of oral argument at p. 16, 11. 6–7, *Formanek v. United States*, Cl.Ct. No. 764–86L (filed February 22, 1989). According to defendant, *Florida Rock* compels the court to dismiss plaintiffs' complaint as to any acreage which is not a part of the access road.

The administrative record belies defendant's assertion that the Corps, in denying plaintiffs' permit application, considered only an 11-acre swath of the parcel onto which plaintiffs would place fill material. The District Engineer found that construction of the "road would result in the direct loss of about 11 acres of high quality wetland. *It is estimated that another 6 acres would be degraded.*" (Emphasis added.)

A.R. 125. This finding clearly indicates that the Corps analyzed the environmental impact of the road on a greater area than just the 11 acres the Corps estimated the road to cover.

Furthermore, it is absolutely evident that the environmental assessment—on which the District Engineer relied heavily in denying plaintiffs' application—recognized the scope of plaintiffs' proposed development project by encompassing the entire parcel. The assessment described the purpose of the project as "provid[ing] an access road for potential commercial/industrial development." A.R. 146. As a result, "[P]roperty values and the likelihood of attracting a developer would be enhanced." A.R. 149. Though the assessment indicated that "[n]o specific plans for buildings, parking lots, etc., exist," the assessment stated: "The proposed access road is the first step in a potential land development venture." Thus, the assessment concluded, *"[t]he 'project site' is the approximately 105 acre [sic] parcel owned by the applicant."* (Emphasis added.) A.R. 142.

The environmental assessment proposed an alternative—"no action"—against which plaintiffs' application was reviewed. This alternative acknowledged that "placement of fill material in wetlands [sic] is essential to the construction of an access road and future development." A.R. 142. Since the "105–acre [sic] project site is nearly all wetland," under the "no action" alternative, "no fill material would be place in wetlands [sic]." *Id.* Therefore, no development would be allowed. *Id.*

The environmental assessment determined that under the "no action" alternative, no adverse impact to the entire wetland complex would occur. However, development of the access road, leading to the sale and future industrial development of the site—"the applicant's ultimate goal"—would completely destroy the "outstanding ecological attributes" of the entire project site. A.R. 158. The assessment concluded also that high quality wetland of the type found on the project site is "irreplaceable and [its] destruction cannot be mitigated." A.R. 161.

Based upon the administrative record which defendant submitted, the court determines that the Corps, in its decision on plaintiffs' application, considered plaintiffs' entire parcel to be the project site. Because the court finds that *Florida Rock* is distinguishable, defendant's attempts to limit the scope of this suit to 11 acres must fail. In *Florida Rock*, Florida Rock Industries, Inc. desired a § 404 permit to allow it to mine limestone on a 1,560–acre tract it owned in the Florida Everglades. The Corps refused to consider an application for more than 98 acres of the tract, enough acreage to suffice for three-years' production. Still, the Corps determined that even a permit for 98 acres would not be in the public interest because of the threatened loss of valuable wetland. Thus, the Corps denied the permit, and Florida Rock sued in the Claims Court.

At trial, plaintiff introduced testimony that the logic of denying the permit for 98 acres would preclude a permit for any other part of the tract. In a bench opinion, the court held that "the denial of the permit for the 98 acres was a taking because it left the plaintiff no reasonable economic uses for the property." *Florida Rock*, 791 F.2d at 897. The court reserved for consideration later whether the rest of the tract was taken. However, the court concluded ultimately that only 98 acres were taken.

Both parties appealed. In its cross-appeal, Florida Rock argued that the whole 1,560–acre tract was taken because the action respecting 98 acres established a precedent that would govern the other acreage. The Federal Circuit denied Florida Rock's cross-appeal, but first indicated that the logic—that, as a practical or legal matter, since Florida Rock couldn't mine on the 1,462 acres excluded from the application process by the Corps, that acreage was taken—was justified. In the Federal Circuit's view, two conditions existed which prevented the court from granting Florida Rock's cross-appeal. First, the court accorded judicial respect to the possibility that "if the Army engineers adverted ... [to] making the government an involuntary purchaser at all, they must have supposed

the exposure would be much reduced by confining their determination to a test case of 98 acres." *Id.* at 905. More important, however, was the fact that "since the 98 acres sufficed for three years, there is no likelihood that Florida Rock would, if allowed, mine over 98 acres in three years. *Therefore, the frustration of any viable economic use, constituting the alleged taking, does not as to the excess commence until over three years have passed.*" (Emphasis added.) *Id.*

This court believes that, in light of *MacDonald,* the first condition the Federal Circuit found to exist in *Florida Rock* is not viable. In *MacDonald,* the Supreme Court stressed that "[a] property owner is of course not required to resort to piecemeal litigation or otherwise unfair procedures in order to obtain [a] determination [of what use if any may be made of the property]." *MacDonald,* 477 U.S. at 350, n. 7, 106 S.Ct. at 2567, n. 7. Yet, in allowing the Corps to reduce its exposure by confining its determination to a "test case" of limited acreage, the court would be encouraging precisely the piecemeal litigation against which the *MacDonald* Court spoke.

Likewise, the second condition in *Florida Rock* is simply inapplicable to the instant case. Defendant has not offered any proof that plaintiffs' economic use of their property cannot be immediate, rather than delayed for years, and thus, too remote as to be merely speculative. The record supports a contrary conclusion that were plaintiffs granted a permit, they could commence quickly use and development of the whole 112 acres. Thus, *Florida Rock* provides no basis for this court to grant defendant's motion to dismiss in part.

Finally, defendant contends that the court does not have jurisdiction over two portions of the parcel—amounting to about 12 acres—which are classified as upland. According to defendant, the Corps cannot prevent plaintiffs from developing the existing upland. Defendant does acknowledge, though, that the upland is completely surrounded by wetland. Plaintiffs' only access to these upland sites is necessarily through the wetland. Yet, as the court has

determined, the Corps' decision can be interpreted as indicating an intention to deny development which involves filling any part of the wetland complex. Thus, this case is again analogous to *Loveladies Harbor.*

In *Loveladies,* defendant also raised the issue that one acre of upland involved in the case could not be held as taken since development of the land could proceed with or without the Corps' approval. The court observed that "[t]he one acre of uplands [sic] is not adjacent to other uplands [sic] property. Rather, the one acre of uplands [sic] is, in effect, an island surrounded by a sea of wetlands [sic]." *Loveladies,* 15 Cl.Ct. at 396. The court concluded that the upland property could properly be considered in a takings suit: "A taking of such property is found where the government's regulations imposed on the surrounding wetlands [sic] have cut off all the routes of access to the property or have cut off all the property's routes of access which remain." *Id., citing Laney v. United States,* 228 Ct.Cl. 519, 523, 661 F.2d 145, 149 (1981). This court holds accordingly that plaintiffs' claim that defendant has taken by regulation their entire 112–acre parcel—including the inaccessible upland acreage—is sufficiently ripe for adjudication.

### III.

Defendant maintains that if the case is ripe for review, then summary judgment is appropriate. Defendant argues that since plaintiffs admit that they have had two purchase offers for the entire tract, the property retains fair market value sufficient enough "to forestall a determination that a taking had occurred or that any just compensation had to be paid by the government." *Florida Rock,* 791 F.2d at 903. Plaintiffs have cross-moved for partial summary judgment. They contend that they are entitled to damages because the Corps' actions "amount simply to the fact that the Corps has determined that [the] property should be left in its 'undeveloped, natural condition'." Thus, they assert that they have been forced to hold their property for the public's benefit. They conclude that these "undisputed facts" compel a de-

termination that the Corps has taken their property.

Summary judgment is appropriate when: (1) there are no genuine issues of material fact in dispute; and (2) the movant is entitled to judgment as a matter of law. In evaluating motions for summary judgment, the court must view the evidence in the light most favorable to the non-moving party. Any doubt as to the existence of issues of material fact must be resolved in favor of the party opposing the motion. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970).

The movant bears the burden of demonstrating the absence of any genuine issue of material fact. *Hodosh v. Block Drug Co.*, 786 F.2d 1136, 1141 (Fed.Cir.1986), *cert. denied*, 479 U.S. 827, 107 S.Ct. 106, 93 L.Ed.2d 55 (1986). However, when the movant has supported his motion, then the opposing party has the burden of coming forward with evidence directed to specific facts showing that there is a genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Mere denials or conclusive statements are not sufficient to raise genuine issues of material fact. *Hodosh*, 786 F.2d at 1141. One must do more than simply show that there is some metaphysical doubt as to the existence of the material fact. *Matsushita Elec. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Given these standards, the court determines that it must deny defendant's motion for summary judgment because defendant has not shown that it is entitled to judgment as a matter of law. Further, the court must deny plaintiffs' motion for partial summary judgment because plaintiffs have not sustained their burden of showing the absence of any genuine issue of material fact.

■ In order to establish a takings claim, the allegedly injured plaintiff must prove that as a result of the regulation, the property's value has been reduced and the property has no remaining economically viable use. *See Kirby Forest Industries Inc. v. United States*, 467 U.S. 1, 14–15,

104 S.Ct. 2187, 2196–97, 81 L.Ed.2d 1 (1984); *Loveladies Harbor*, 15 Cl.Ct. at 394. Defendant claims that plaintiffs are unable to carry their burden of proof. Defendant reasons that since plaintiffs have received two offers for their property, there exists a "solid and adequate fair market value." *Florida Rock*, 791 F.2d at 903. Thus, defendant concludes that the property retains viable commercial uses.

■ Plaintiffs received the two offers to purchase—subject to availability of funds—from the Nature Conservancy and the Minnesota Department of Natural Resources. Both organizations would preserve the land in its natural state—i.e., as an empty lot—to provide habitat for rare plants, rare animals, and unique plant communities. A.R. 248–252. In light of *Loveladies Harbor*, the court determines that these offers are insufficient to entitle defendant to judgment as a matter of law.

The property in *Loveladies Harbor* had a post-regulation value based on the possibility that the property could have been purchased by the private sector for conservational uses or by the government for additional acreage in a nearby wildlife refuge. *Loveladies Harbor*, 15 Cl.Ct. at 394. According to the court: "The land could no longer be developed in any manner *nor was there any evidence presented which showed that the land could have been an attractive purchase for speculators.*" (Emphasis added.) *Id.* at 395, *citing Florida Rock Industries, Inc. v. United States*, 791 F.2d 893, 901–03 (Fed.Cir.1986). Thus, the court determined that the land could remain only in its natural state and had no viable commercial or recreational uses. *Id.*

The court refused to apply "cases [which] have held that land cannot be viewed as taken where that land must remain in its natural state since an 'owner of land does not have an absolute and unlimited right to change the essential character of ... [its] land so as to use it for a purpose which it was unsuited in its natural state.'" *Id., citing Sibson v. State*, 115 N.H. 124, 336 A.2d 239, 243 (1975). Rather, the court "reject[ed] the idea that a Fifth Amendment takings claim can be avoided by requiring citizens to sell their property where the government's intrusion

has reduced the value of the property to a mere fraction and *where the property was left with no other available uses."* (Emphasis added.) *Id.* This court adopts the view presented by *Loveladies Harbor* that an offer to purchase made by a conservation group which would maintain the property in its natural state is not a speculative, commercial, or recreational use which would refute plaintiffs' taking claim as a matter of law. Thus, the court denies defendant's motion for summary judgment.

█ In their cross-motion for summary judgment, plaintiffs argue that the "undisputed facts" compel a conclusion that the Corps has taken the property. Just compensation cases, though, are naturally fact-intensive. *Yuba Goldfields, Inc. v. United States,* 723 F.2d 884, 887 (Fed.Cir.1983). The court must engage in an ad hoc consideration of the economic impact of the regulation on the plaintiffs and of the extent to which the regulation has interfered with distinct investment-backed expectations. Because the court is constrained to resolve all doubts, inferences, or issues of credibility under a motion for summary judgment against the moving party, *Candeleria v. United States,* 5 Cl.Ct. 266, 271 (1984), the required factual inquiry in a takings case is better suited for trial. In the instant case, the court is convinced that the defendant must have the opportunity to refute plaintiffs' allegations in the context of a trial. Indeed, this case could *clearly* benefit from further, thorough factual ventilation. *See Philadelphia Suburban Corp. v. United States,* 217 Ct.Cl. 705 (1978).

In an inverse condemnation case, the court first has to compare the value of the property before the regulation with the value remaining after the regulation. *Keystone Bituminous Coal Ass'n v. DeBenedictus,* 480 U.S. 470, 107 S.Ct. 1232, 94 L.Ed.2d 472 (1987). After an exhaustive reading ·and review of the pleadings, the affidavits, and the voluminous administrative record, the court has determined that there are many facts relating to the property's pre- and post-regulation values which remain in dispute. Plaintiffs have not offered any solid evidence to prove the price they paid for the property. Nor have they produced any appraisals to establish the value of the property, whether subject to or not subject to the regulation. The court expects that these facts, as well as numerous others, will be fully developed at trial of this matter. The court denies accordingly plaintiffs' motion for ·partial summary judgment.

## CONCLUSION

Plaintiffs' allegation that the Corps' action has deprived them of all reasonable beneficial use and enjoyment of their property states a claim which is ripe for review by this court. The court will not limit its review of plaintiffs' claim to just 11 acres because the administrative record indicates that the Corps' denial of plaintiffs' § 404 permit application was based on an assessment of the entire parcel as the project site. Further, the court must include in its consideration of the merits 12 acres of upland, which plaintiffs claim are inaccessible since the upland is surrounded by wetland. Therefore, the court denies defendant's motion to dismiss and motion to dismiss in part.

The court denies also the parties' cross-motions for summary judgment. Defendant has not proved that it is entitled to judgment as a matter of law. The court rejects defendant's proposition that an offer to purchase made by a conservation group or a government agency is a speculative, commercial, or recreational use of property sufficient to overcome a fifth amendment just compensation claim as a matter of law. Likewise, plaintiffs have failed to carry their burden of showing the absence of any genuine issue of material fact. Plaintiffs have not developed fully a factual record which supports their motion for partial summary judgment. Thus, the court determines that the issues presented by this case are better suited for trial.

The court will by later order require further proceedings in accordance with this opinion.

No costs.