Ray FORMANEK, et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 764–86L.

United States Claims Court.

May 14, 1992.

Robert L. Schnell, Minneapolis, Minn., for plaintiffs.

Susan V. Cook, Washington, D.C., with whom was Steven P. Adamski, St. Paul, Minn., of counsel, for defendant.

## OPINION AND ORDER

ROBINSON, Judge:

In this Fifth Amendment taking case, plaintiffs seek damages arising from defendant's denial of a Clean Water Act permit to discharge fill on plaintiffs' land. Plaintiffs also seek interest, attorney fees and costs. Trial was held May 14–24, 1991, in St. Paul, Minnesota. Oral and documentary evidence were admitted at the trial, and

post-trial briefs were filed. Upon full consideration of the entire trial record, the court concludes that plaintiffs prevail in this action. For the reasons stated herein, the court finds that a taking has occurred and that plaintiffs are entitled to just compensation.

*Factual Background*

The relevant facts are set forth in an earlier published opinion, *Formanek v. United States,* 18 Cl.Ct. 785, 787–89 (1989), and are repeated only to the extent necessary here. Plaintiffs in this action own certain real property in Savage, Minnesota in the following proportions: Mr. Ray Formanek, ½; Mr. Ray Formanek and Mrs. Joan Formanek, ¼; Jerome V. Blatz, ⅛; and Johan M. Larsen, ⅛.[1] As is often the case with large tracts of land, plaintiffs' ownership interests changed over the years. In 1960, Mr. Formanek purchased 160 acres in Savage for $18,000.[2] On August 10, 1960, Mr. Formanek conveyed an undivided ½ interest in the entire 160 acre parcel to Lake Marion Development Company and an undivided ¼ interest to Mr. J.A. Torbol. On March 7, 1966, Mr. Formanek reacquired an undivided ¼ interest in the 160 acre parcel from the estate of Mr. Albert A. Ogdie for $12,000, which estate had received this interest from Lake Marion Development Company after Mr. Ogdie's death. On May 18, 1966, Mr. and Mrs. Formanek acquired an undivided ¼ interest in the property from J.A. Torbol for $12,000. Thus, by 1966, the Formanek's owned an undivided ¾ interest in the 112 acre parcel which is the subject of this litigation.[3]

The property at issue in the instant case consisted of 12 acres of uplands, over which the U.S. Army Corps of Engineers ("Corps") has no jurisdiction, and 99 acres of wetlands. Within the wetlands were 45 acres of a calcareous fen plant community.[4] The property lies within the Minneapolis–Saint Paul, Minnesota metropolitan area. Specifically, the property comes within the municipal boundaries of Savage, Minnesota and is part of an area known as the Savage Fen Wetland Complex. The Savage Fen consists of approximately 500 acres containing an alkaline, groundwater-fed peat. The Fen supports a variety of wetland plant communities including sedge meadow, shrub-carr, hardwood trees and other plants which are indigenous to a calcareous fen. In short, the Fen is a rare wetland plant community.

At the time Mr. Formanek purchased the property, he did not know that it contained a calcareous fen or unusual wetlands. He learned of the Fen years later when the Minnesota Department of Natural Resources (DNR) and the Corps became interested in his land. The DNR first became interested in the Fen in 1979. In 1980, Mr. Welby Smith, a botanist for the DNR's Natural Heritage Program, began to visit the property to study and catalogue the plants located there. Typically, Mr. Smith would walk around the property, look for the presence or absence of any endangered, threatened or special concern plant species and remove samples of these plants from the property. Of his eleven trips onto plaintiffs' property, at least two were unauthorized and several included bringing tours of people onto the property. The Saint Paul District of the Corps became aware of the ecological significance of the Fen in 1979 as a result of a lawsuit involving the Black Dog Fen in a neighboring Minneapolis–Saint Paul suburb. Beginning in 1981, Mr. Steve Eggers, a Corps branch ecologist, made several trips onto the property without the owners' permission to study and photograph the plants. The Corps considered exercising discretionary

---

1. Shortly after defendant's denial of plaintiffs' permit application in 1986, Ms. Ruth G. Lounsbury acquired the undivided interests of Messrs. Blatz and Larsen.

2. The 160 acres included a 40–acre parcel which is not part of the property at issue in this action.

3. Mr. Formanek sold a portion of the original parcel in 1984 to the New Vector company. As a result of this transfer, plaintiffs lost their access to uplands on their property.

4. "A calcareous fen is an area of saturated or inundated peat with a high concentration of calcium carbonates in the soil and water." *Formanek v. United States,* 18 Cl.Ct. at 787.

authority over the fen as early as June, 1982 but delayed action when it learned that the state was negotiating with plaintiffs to buy the property for a use compatible with wetlands.

DNR representatives first offered to buy plaintiffs' property in 1981. Both parties had appraisals done of the land. Based on their appraisal, the DNR offered plaintiffs $590,000 for the land. Mr. Formanek refused the offer as his appraisal was more than twice that amount. The DNR's subsequent offers to buy the land were even lower and negotiations eventually were terminated.

On July 21, 1983, Mr. Dennis E. Cin, Chief of the Corps' Regulatory Functions Branch, notified Mr. Formanek that the Corps had exerted discretionary authority over a portion of the property's wetlands to override the nationwide permit requirement. A nationwide permit is a general permit which authorizes discharge or fill activities throughout the country with minimal constraints. *See* 33 C.F.R. § 330.1. The Corps' exertion of discretionary authority prohibited the development of the Formanek property without an "individual permit." The individual permit procedure is more protracted than the nationwide permit process and requires a public hearing and determination of whether the proposed discharge is in the public interest. *See* 33 C.F.R. § 323.2(g).

Mr. Formanek contacted the DNR immediately upon the receipt of Mr. Cin's letter. On July 25, 1983, Mr. Denis C. Dailey, Supervisor of Realty Specialists for the DNR, responded to Mr. Formanek in writing. In his letter, Mr. Dailey noted that "potential restraints as the Corps of Engineers may impose on the development of this land may also affect the highest and best use of the property and consequently the value."

Apparently, Mr. Cin's letter was premature as the Corps waited until November 29, 1983 to officially exert control over a 40 acre portion of the Savage Fen. On March 4, 1985, the Corps extended its discretionary authority over 146 more acres of the fen. Thus, all of Mr. Formanek's property except the uplands was subject to the individual permit requirement. On October 9, 1985, plaintiffs filed a § 404 permit (33 U.S.C. § 1344) application with the Corps to place fill material on the property to build an access road. This application was denied and litigation ultimately ensued.

## DISCUSSION

■■■ A perennial headwater stream originates from springs and seepages at the toe of the property's southern bluff and extends through its western edge and ultimately flows into the Minnesota River, a navigable water of the United States. Thus, the Fen is considered to be itself a water of the United States. Section 404 of the Federal Water Pollution Control Act (Clean Water Act), 33 U.S.C. § 1344, authorizes the Secretary of the Army, acting through the Corps, to issue permits for discharge of fill in the navigable waters of the United States. The Corps' denial of the section 404 permit was not appealed and, therefore, is not subject to review by this court under any standard. Consequently, this court must accept the legality of the Corps' action in denying plaintiffs' permit application. In addition, the court assumes that the Clean Water Act advances a legitimate state interest. *Deltona Corp. v. United States*, 228 Ct.Cl. 476, 489, 657 F.2d 1184, 1192 (1981), *cert. denied*, 455 U.S. 1017, 102 S.Ct. 1712, 72 L.Ed.2d 135 (1982). Thus, the only issue before the court is whether the permit denial constitutes a taking under the Fifth Amendment for which the public, and not the individual property owners, must bear the burden. *Id.* 228 at 488, 657 F.2d at 1191.[5]

---

**5.** Plaintiffs also claimed at trial that the repeated entries upon their land by Corps and DNR employees constituted a physical taking. While plaintiffs showed that these entries were often unauthorized, the court concludes that no physical taking has occurred. There was no interest by the government officials who visited

the site to diminish any of the owners' rights simply by walking over the property and taking a few plant species. The owners' bundle of rights remained in all material respects intact notwithstanding plaintiffs' understandable outrage at a governmental trespass. If that outrage had been sufficient to warrant seeking legal

■ The Fifth Amendment provides that no private property shall be taken for public use without just compensation. This mandate has been interpreted to encompass regulatory restrictions on land· use where it "does not substantially advance a legitimate state interest or if it 'denies an owner economically viable use of its land'." *Loveladies Harbor, Inc. v. United States,* 21 Cl.Ct. 153, 155 (1990) (*"Loveladies Harbor II"*) (quoting *Agins v. Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980)). There is no precise formula for determining whether a landowner has been deprived of economically viable use of his property. Instead, the court must make "ad hoc, factual inquiries into the circumstances of each particular case." *Connolly v. Pension Ben. Guar. Corp.,* 475 U.S. 211, 224, 106 S.Ct. 1018, 1026, 89 L.Ed.2d 166 (1986).

To aid in this determination, however, we have identified three factors which have "particular significance": (1) "the economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and (3) "the character of the governmental action."

*Id.* at 224–25, 106 S.Ct. at 1026 (citing *Penn Cent. Transp. Co. v. New York City,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978)). *See also Keystone Bituminous Coal Ass'n v. DeBenedictis,* 480 U.S. 470, 494–95, 107 S.Ct. 1232, 1246–47, 94 L.Ed.2d 472 (1987).

■ As the court stated in its earlier opinion, "[i]n an inverse condemnation case, the court first has to compare the value of the property before the regulation with the value remaining after the regulation." *Formanek v. United States,* 18 Cl. Ct. 785, 798 (1989). However, [i]f there is found to exist a solid and adequate fair market value ... which [plaintiffs] could have obtained from others for that property, that would be a sufficient remaining

use of the property to forestall a determination that a taking had occurred...." *Florida Rock Indus., Inc. v. United States,* 791 F.2d 893 (Fed.Cir.1986), *cert. denied,* 479 U.S. 1053, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987). For the reasons which follow, the court concludes that the Corps' denial of plaintiffs' permit application had a severe economic impact on the value of the property.

### A. Value Before Government Action.

In *Loveladies Harbor II,* the court set forth the industry definition of "fair market value" as follows:

The most probable price, as of a specified date, in cash, or in terms equivalent to cash, or in other precisely revealed terms, for which the specified property rights should sell after reasonable exposure in a competitive market under all conditions requisite to a fair sale, with the buyer and seller each acting prudently, knowledgeably, and for self-interest, and assuming that neither is under undue duress.

*Loveladies Harbor v. United States,* 21 Cl.Ct. 153, 156 (1990) (quoting *American Institute of Real Estate Appraisers, the Appraisal of Real Estate,* 19 (9th ed. 1987)). In addition, "valuations in eminent domain proceedings 'may reflect not only the use to which the property is presently devoted but also that use to which it may be readily converted.'" *Loveladies Harbor II,* 21 Cl.Ct. at 156 (quoting *United States v. Powelson,* 319 U.S. 266, 275, 63 S.Ct. 1047, 1052, 87 L.Ed. 1390 (1943)).

Mr. Mark S. Parranto, plaintiffs' appraiser, testified at trial that the highest and best use for the property would have been as a multiple-lot, industrial park subdivision with a value of $1.2 million. This appraisal was based on a comprehensive study of 14 comparable sites, adjusted for time, location and size. Mr. Parranto emphasized that the subject property was

---

redress, other legal recourse was available to plaintiffs. Although samples of plants were taken from the property, the court considers the invasions, regardless of whether they were contrary to state or local laws, to not be of suffi-

cient magnitude to be more than a minor nuisance and to not significantly infringe upon plaintiffs' rights. *See generally Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982).

zoned industrial, had excellent access to major highways, had available utilities, and was located in an area enjoying rapid industrial development. Mr. Parranto also took into account the soil testing conducted by Braun Engineering, which indicated that considerable soil corrections would be required for development of the land. Therefore, Mr. Parranto adjusted the value downward to reflect the cost of soil correction after consulting with Mr. Dickman Knutson, a registered engineer specializing in soil correction, who also testified at trial.

Defendant claims that the Formanek property could not have been developed as an industrial park due to state and local regulatory restrictions and poor soil quality. The government contends that the 1982 City of Savage Comprehensive Plan precluded the industrial development of the property. In addition, defendant questions the feasibility of development because of poor site access, the failure of the city to assess the property for utilities, and existing easements on the land. The government's experts also testified at trial that the groundwater levels at the site were extremely high. Thus, defendant claims that plaintiffs' claimed value of the land at its highest and best use is inflated as soil corrections would be prohibitively expensive.

### 1. State and Local Regulatory Restrictions.

Defendant argues that there were a number of restrictions on the industrial development of plaintiff's property at the time of the Corps' denial of the section 404 permit application. The government contends that even if the Corps had granted plaintiffs' permit application, the state or the EPA would have intervened to prevent development of the Fen. In addition, defendant argues that plaintiffs' 1986 development plan was faulty in that it would have required variances from the City of Savage ordinances. Finally, the government asserts that the development plan

also conflicted with the city's comprehensive plan.

#### a. *Competing Agency Jurisdiction.*

Defendant's appraiser, Mr. Brad Bjorklund, testified that the Corps' denial of plaintiffs' permit application had no adverse impact on the value of the land. In his view, even if the Corps had allowed fill activities in the Fen, the DNR would have prevented the property's development. Thus, the court must determine whether the Corps was alone in its ability and desire to preclude industrial conversion of the Formanek parcel.

Under Minn.Stat. § 84.0895 (1986):

[A] person may not take, import, transport, or sell any portion of an endangered species of wild animal or plant, or sell or possess with intent to sell an article made with any part of the skin, hide, or parts of an endangered species of wild animal or plant, except as provided in subdivision 2 and 7.

Defendant argues that plaintiffs would have had to obtain a permit from the DNR for the taking of endangered or threatened plants in order to the develop the Fen. It is undisputed that plaintiffs never applied for such a permit. However, a permit is not required if the property falls within the subdivision 2 and 7 exceptions. Subdivision 2(a)(1) exempts "plants on land classified for property tax purposes as class 2a or 2c agricultural land under section 273.-13...." In the instant case, the Formanek property was classified as class 2c property for tax purposes.[6] Therefore, the DNR has no jurisdiction over any plants on the Formanek property, regardless of whether threatened or endangered.

In any event, no evidence exists that the DNR ever asserted jurisdiction over the Fen to stop its development. The DNR had full knowledge of the plaintiffs' application to the Corps in 1986 and therefore could have asserted jurisdiction. Its failure to do so now precludes the DNR from requiring that plaintiffs obtain a DNR permit. *See* 33 U.S.C. § 1341(a). Failure to

---

**6.** Minn.Stat. § 273.13, Subd. 23, defines class 2c property as "real estate that is non-homestead agricultural land.... Agricultural use may in-

clude pasture, timber, waste, *unusable wild land* and land included in federal farm programs." (Emphasis added.)

assert jurisdiction over the Fen indicates that the DNR's interpretation does not materially differ from that urged by plaintiffs and accepted by the court.

After a careful review of the parties' arguments, the court is convinced that no other federal or state agency had asserted any jurisdiction over the property in 1986. It was unnecessary for the EPA to exercise its veto power in this case as the Corps had already denied plaintiffs' permit application. However, the court notes that the EPA would likely have vetoed any permit for the development of plaintiffs' property given that the agency, thus far, has blocked construction of County Road 27, which would have provided improved roadway access to the property.

### b. *City Variance Requirements.*

Plaintiffs' 1986 development plan would have potentially required several variances. For instance, plaintiffs planned to construct a cul de sac which would have exceeded the length permitted by city ordinance. In addition, the proposed development did not conform to city requirements concerning the ratios of storage to buildings and floor area to land. Based upon the convincing testimony of Mr. Rod Hopp, Mayor of Savage, and Mr. Mark McNeill, City Administrator, this court is convinced that these variances would have been easily obtained.

However, the government does not argue that these variances were unobtainable. Rather, defendant asserts that the variances combined with the unsightliness of the outside storage would render the development of the property unfeasible. This argument fails to take into account the city's enthusiasm for industrial development of that area. Messrs. Hopp and McNeill both testified to the city's efforts on plaintiffs behalf. Mr. Hopp went so far as to introduce Mr. Formanek to Mr. Ervin Wangarin, an experienced dirt contractor who had unique equipment, materials and available facilities for assisting in the development of the property. In addition, the city had just completed a large water and sewerage project in the area and was under a great deal of financial pressure to expand its tax base to pay off the bonds used to finance the project. The court finds that the City of Savage was highly motivated to grant variances for development projects and presented no impediment to the development of the Formanek property in 1986.

### c. *Zoning Restrictions.*

The court substantially agrees with Mr. Parranto's assessment of the development potential of the Formanek property. Notwithstanding the property's designation as a nature preservation area in the city's Comprehensive Plan, the court concludes that plaintiffs could have developed the property into a light industrial park in accordance with the city's zoning ordinance. The court accepts plaintiffs' contentions that the nature preservation designation came about because the city officials believed that the property was soon to be purchased by the DNR for that purpose. Moreover, the court does not find that the Metropolitan Council's opposition to a change in the Plan, returning the property to its former industrial designation, affects the city's power to make that change. In any event, plaintiffs' proposed project is consistent with the Savage zoning ordinance and is, therefore, unhindered by the Plan. Under state law, if the comprehensive municipal plan is in conflict with the zoning ordinance, the latter supersedes the former. Minn.Stat. § 473.858 (1986).

### 2. Site Access.

The plaintiffs' property is located just south of State Highway 13. 126th Street provides access across the parcel's northern boundary but is not an improved roadway in front of the property. In addition, the construction of County Road 27 has been blocked by the EPA, despite the support of the city and state. However, the court finds that there is no physical impediment to access to the property from proposed County Road 27 as it already exists as a haul road. Fabcon, Inc., which operates a concrete plant on the parcel adjoining plaintiffs' property, constructed the road to access materials from a borrow pit located on Mr. Karl Bohn's neighboring

property. Thus, the road is available to plaintiffs for the same purpose.

### 3. Utilities and Easements.

The court further concludes that utilities were available to the Formanek property. Notwithstanding the city's failure to assess the property for utilities, its construction of the water and sewerage treatment plant northeast of the property provided the necessary access to those utilities. While Savage may charge for hooking up the utilities to the property itself, there is no evidence that this would be a major cost item, or that it would hinder the implementation of plaintiffs' development plan.

Defendant failed to show at trial that the easements on the property (a pipeline owned by Williams Brothers and power lines owned by Northern States Power Company) were impediments to the construction of 127th street and the cul de sac. Both Mr. Parranto and Mr. Ervin Wangarin, who performed the dirt work on neighboring property, testified that they had worked with Williams Brothers and NSP and had found them to be very helpful in getting the job done without hurting their respective lines.

### 4. Groundwater Levels.

As for the groundwater levels at the site, the court found defendant's experts, Messrs. Hoagberg and Spaulding, almost totally lacking in credibility. Both witnesses presented detailed reports from their studies which contained material errors, some of which were never corrected for the record. It is clear that the property contains relatively high groundwater. However, there were only two wells drilled by

Hoagberg which indicated the existence of excess hydrostatic pressure or an artesian level above the ground surface. Mr. Hoagberg rejected significant data which indicated more favorable conditions than shown by his borings because he did not regard such evidence as reliable. The court cannot be convinced by an approach which fails to properly consider all relevant information. The court finds that the flow of water on the property is generally from the southeast to the northwest toward a creek which provides adequate drainage. Although the property water level obviously varies greatly, the court concludes that the property was sufficiently well drained to the northwest so as not to prohibit the proposed development.

### .5. Valuation.

Although the court found Mr. Parranto to be a very credible witness, it cannot accept his development plan number in total because it includes development of approximately 40 acres of the outlot area. The court must accept the overwhelming weight of all the expert testimony which established that the outlot contained peat of up to 40 feet deep and was, accordingly, unsuitable for profitable development. However, for purposes of determining the feasibility of the development of this property, the court generally accepts Mr. Parranto's development cost analysis for the remaining 65.8 acres. Over a six year sales term, with a 12 percent interest rate, an eight percent safe rate, and a square foot value of $1.25 for the 65.8 acres, the court finds the value of the Formanek parcel prior to government action was as follows:

### FORMANEK PROPERTY

| Sales Year | Value/SF | Sales Price | Sub–Total |
|---|---|---|---|
| 1 | $1.25 | $597,135 | |
| 2 | 1.31 | 626,992 | |
| 3 | 1.38 | 658,341 | |
| 4 | 1.45 | 691,258 | |
| 5 | 1.52 | 725,821 | |
| 6 | 1.60 | 762,112 | |
| | | | $4,061,659 |

Adjustments

| | | |
|---|---|---|
| Sales Fee | ($ 284,316) | |
| Development Costs[7] | ( 1,586,889) | |
| Interest Expense | ( 575,919) | |
| Taxes and Fees[8] | ( 50,000) | |
| | | $1,664,535 |
| Present Value of Average Cash Flow | ( 439,092) | |
| Property Value @ 35% RTE[9] | ( 312,522) | $ 892,921 |
| Remaining 41 acres @ $1,000 per acre | | $ 41,000 |
| INDICATED PROPERTY VALUE | | $ 933,921 |

Plaintiffs have proven that the highest and best use of their property before the governmental action was as a multi-lot industrial development. The court finds that this use of the Formanek property would have been reasonable and economically feasible. Based on the expert testimony and accompanying documentary support, the court concludes that the fair market value of plaintiffs' property prior to the Corps' denial of the permit application was $933,921.

B. *Value After Government Action.*

The government argues that there has not been a taking of plaintiffs' property because economically viable uses of the land remain. Specifically, defendant contends that plaintiffs could develop the uplands in the northern section of their property without the necessity of a Section 404 permit from the Corps. Although Mr. Formanek sold his access to the uplands in the 1984 transfer to New Vector, the government argues that plaintiffs could obtain an easement on which an access road could be constructed. If this were not possible, defendant asserts that the Corps would grant a permit to construct such an access road.

"[T]he court sitting as finder of fact must discount proposed uses that do not meet a 'showing of reasonable probability that the land is both physically adaptable for such use *and* that there is a demand for such use in the reasonably near future'." *Loveladies Harbor, Inc. v. United States,* 21 Cl.Ct. 153, 158 (1990) (quoting *United States v. 341.45 Acres of Land,* 633 F.2d 108, 111 (8th Cir.1980)). In the instant case, the court finds that defendant's proposed uses for plaintiffs' property fail to meet the standard of reasonable probability. Defendant's present assurances that no permit would be needed to develop the uplands, and that the Corps would readily grant a permit to construct an access road, strike the court as convenient arguments rather than feasible alternatives. Even if plaintiffs were able to develop a portion of their land, it is far from certain that a market would exist for an industrial lot surrounded by land rendered undevelopable by government action.

Defendant's expert, Mr. Brad Bjorklund, testified that limited development of the uplands area was the only practical use of the property prior to the government action and is the only practical use now. Thus, in Mr. Bjorklund's view, "without the fill permit, the market value remains unchanged, in other words, the fill permit has no effect

7. The development costs would be as follows:

| | |
|---|---|
| Grading | $ 445,740 |
| Sanitary Sewer | 88,310 |
| Storm Sewer | 424,710 |
| Water Mains | 93,640 |
| Streets | 192,150 |
| Consulting Engineer | 105,000 |
| City Administration | 18,705 |
| Area Assessments | 169,884 |
| Park Fees | 48,750 |
| | $1,586,889 |

8. This item includes real estate Taxes, insurance and professional fees.

9. "RTE" is the anticipated return to equity.

on market value...."[10] In light of the evidence discussed above, the court finds Mr. Bjorklund's testimony incredible. Plaintiffs' proposed development of the property was feasible in light of the industrial zoning, city backing, excellent site access, and available utilities. Plaintiffs have shown that the sole factor which prevented the development of the property was the Corps' denial of the permit application. The court accepts Mr. Parranto's opinion that without the fill permit, plaintiffs' entire parcel is worth perhaps $1,000 an acre.

As the court found in its earlier opinion, the fact that plaintiffs received two offers to purchase the land from nature conservationists does not establish that there exists a "solid and adequate fair market value." *Formanek v. United States*, 18 Cl.Ct. 785, 797 (1989) (quoting *Florida Rock Indus., Inc. v. United States*, 791 F.2d 893, 903 (Fed.Cir.1986)). The offers plaintiffs received were for far less than the value of the property prior to government action and "were not the product of negotiations between a willing buyer and seller under no duress." *Florida Rock Indus., Inc. v. United States*, 21 Cl.Ct. 161, 175 (1990). Although Mr. Parranto admitted that the land could be worth as much as $490,000 as a nature preservation area, there is no incentive to purchase the land for that purpose as the government's action ensures that the land will be maintained in its natural state. Accordingly, the court finds that no competitive market exists for plaintiffs' property without the possibility of development.

### C. Government Liability and Damages.

The result of the comparison of fair market value before and after government action must establish more than a "mere diminution in value." *Loveladies Harbor, Inc. v. United States*, 21 Cl.Ct. 153, 160 (1990). "Government could hardly go on if to some extent values incident to property could not be diminished without paying for every such change in the general law." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 413, 43 S.Ct. 158, 159, 67 L.Ed. 322 (1922).

In the instant case, the court is convinced that the Corps' denial of plaintiffs' permit application rendered the property all but worthless.

Defendant argues that government action to prevent public nuisance or harm precludes the payment of compensation. However, the caselaw which defendant cites in support of this contention is inapposite to the instant case. *See, e.g., Miller v. Schoene*, 276 U.S. 272, 48 S.Ct. 246, 72 L.Ed. 568 (1928) (State of Virginia not required to compensate owners of trees destroyed to prevent the spread of disease); *see also Allied–Gen. Nuclear Servs. v. United States*, 839 F.2d 1572 (Fed.Cir.1988) (government refusal to recommence consideration for nuclear power plant proper in light of moratorium on the commercial reprocessing of plutonium where goal is to secure international nonproliferation). Plaintiffs' proposed development simply did not present the extreme threat to public health, safety and welfare which precluded the payment of compensation in those cases.

■ The value before the taking was $933,921; the value after the permit denial was perhaps $112,000. This change clearly exceeds the "mere diminution in value" which our society must tolerate in order for government to effectively operate. Of course, a substantial reduction in value alone is not sufficient support for the finding of a taking. *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 131, 98 S.Ct. 2646, 2662–63, 57 L.Ed.2d 631 (1978). The court must further consider the owners' investment-backed expectations. The court heard substantial and credible testimony as to Mr. Formanek's expectations for the use of his property. It is beyond question that the property was purchased for the sole purpose of industrial development. Mr. Formanek and his partners were not aware of the unique nature of the property nor did they ever intend to purchase a nature conservancy. The court finds that the dramatic reduction in the property's value as a result of the permit

---

**10.** Trial Tr. at 1500.

denial, combined with the government's interference with the plaintiffs' investment-backed expectations, constitutes a taking.

■ When property is taken by the government, the damages are measured by the fair market value at the time of the taking. *Loveladies Harbor*, 21 Cl.Ct. at 161 (citing *Yuba Natural Resources v. United States*, 904 F.2d 1577, 1580 (Fed. Cir.1990)). For the reasons discussed above, the court finds that plaintiffs are entitled to $933,921 in compensation.

## CONCLUSION

■ The court concludes that the denial of plaintiffs' permit application constituted a taking of plaintiffs' property as of June 25, 1986. As the Fifth Amendment demands just compensation, the court awards plaintiffs $933,921, plus interest from the date of the taking.[11] Plaintiffs are hereby instructed to convey the fee simple to the United States upon satisfaction of the judgment.[12]

The Clerk shall enter judgment accordingly.

---

**11.** It is well established that plaintiff, as an owner of property taken by the Government pursuant to the Fifth Amendment, is entitled to interest computed from the date of the taking to the date of payment by defendant. *United States v. Thayer–West Point Hotel Co.*, 329 U.S. 585, 588, 67 S.Ct. 398, 399–400, 91 L.Ed. 521 (1947). Moreover, this court, to set forth a uniform method of establishing interest rates after January 1, 1980, has applied the same interest rates established under the method provided for in the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613 (1988). Such rates are established by the Secretary of the Treasury pursuant to Pub.L. No. 92–41, 85 Stat. 97. *Houser v. United States*, 12 Cl.Ct. 454, 474 (1987). Accordingly, interest in this case is to be computed at the following rates:

June 26 – June 30, 1986: 9 ¾%
July 1 – Dec. 31, 1986: 8 ½%
Jan. 1 – June 30, 1987: 7 ⅝%

July 1 – Dec. 31, 1987: 8 ⅞%
Jan. 1 – June 30, 1988: 9 ⅜%
July 1 – Dec. 31, 1988: 9 ¼%
Jan. 1 – June 30, 1989: 9 ¾%
July 1 – Dec. 31, 1989: 9 ⅛%
Jan. 1 – June 30, 1990: 8 ½%
July 1 – Dec. 31, 1990: 9 %
Jan. 1 – June 30, 1991: 8 ⅜%
July 1 – Dec. 31, 1991: 8 ½%
Jan. 1 – June 30, 1992: 6 ⅞%

**12.** The government objects to the conveyance of a fee simple interest in the property as it is not receiving credit for the after value of the property. However, this position conflicts with the well-established rule that just compensation is measured by the fair market value of the property prior to the taking. *Loveladies Harbor*, 21 Cl.Ct. at 161.