623 A.2d 940

**Mr. and Mrs. Conrad MOCK, Petitioners,**

v.

**DEPARTMENT OF ENVIRONMENTAL RESOURCES, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Nov. 18, 1992.

Decided March 25, 1993.

John A. Van Luvanee for petitioners.

Martha E. Blasberg for respondent.

Before CRAIG, President Judge, and DOYLE, COLINS, McGINLEY, SMITH, PELLEGRINI and KELLEY, JJ.

CRAIG, President Judge.

Conrad and Barbara Mock appeal from a decision of the Pennsylvania Environmental Hearing Board, which upheld the Department of Environmental Resources' denial of the Mocks' permit to fill wetlands on their property to construct an auto repair shop, and also ruled that the department's denial did not effect an unconstitutional taking of the Mocks' property.

The Mocks do not challenge the board's determination that the department correctly denied the permit application under the applicable statutes and regulations. Therefore, the sole question for our review is whether the department's permit denial accomplished a taking, under the U.S. and Pennsylvania Constitutions, for which the Mocks must be compensated.

Because the circumstances of this case do not fall within the newly articulated categorical rule in *Lucas v. South Carolina Coastal Council,* —— U.S. ——, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), nor do they qualify as a taking under traditional

takings analysis, we hold that the board did not err in deciding that the Mocks did not suffer a unconstitutional taking when the department denied their permit application.

## BACKGROUND

The relevant facts from the record are as follows. The Mocks are part-owners of a 5.2 acre tract of land in Bucks County, Pennsylvania, which they bought in 1963. The western edge of the parcel fronts along a busy road in a "C–2 Highway Commercial District" as designated by the local zoning ordinance.[1] Auto repair shops are a permitted use in the Highway Commercial District, under section 1401a of the Ordinance. All of the parcels surrounding the Mocks' site have been developed, but the Mocks have not subdivided or developed their land since they bought it in 1963.

Of the 5.2 acres on the site, 3.94 acres are wetlands, as defined by the department's regulations at 25 Pa.Code § 105.-1.[2] The Mocks do not dispute the definition or delineation of the wetland areas on their property. The approximately 1¼ acres of non-wetlands, known as upland areas, are located in the southwest and southeast corners of the parcel, are rather steeply sloped in places, and are separated by approximately 100 feet of wetlands. A stream, Pine Run Creek, runs roughly along the northern boundary of the property.

In 1988 the Mocks applied to the department for a permit[3] to fill .87 acres of wetlands on their property, to enable them to build their proposed auto repair shop and its associated driveways and parking spaces. The department regulates

1. Zoning Ordinance of the Township of Plumstead, July 1989, (Ordinance).

2. Wetlands are defined as "areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions, including swamps, marshes, bogs and similar areas." 25 Pa.Code § 105.1.

3. The Mocks submitted a Joint Permit Application to the department, one copy of which was forwarded to the U.S. Army Corps of Engineers for their evaluation of the project. However, only the department's permit denial is at issue here.

activities which may affect wetlands under the provisions of the Dam Safety and Encroachments Act, (Act), Act of November 26, 1978, P.L. 1375, *as amended,* 32 P.S. §§ 693.1–693.27, and according to the regulations implementing the Act in 25 Pa.Code §§ 105.1–105.451.

The department conducted a preliminary review of the Mocks' application and concluded that the project, as proposed, presented potentially significant adverse environmental impacts under the criteria listed in 25 Pa.Code § 105.14(b). In a letter to the Mocks dated September 23, 1988, the department specified that the proposed project had an impact on the wetland ecology, and that the auto repair shop did not need to be built close to water, two relevant concerns under 25 Pa.Code §§ 105.14(b)(4) and (b)(7).

In that letter, the department also requested that the Mocks submit additional information about alternatives to the project which could reduce the adverse environmental impacts, additional information about the need for the project and its resulting public benefits, and its effect on the natural condition of the wetlands involved. The department identified these issues as necessary considerations pursuant to 25 Pa.Code §§ 105.15 and 105.16. As part of the preliminary review, the department also considered the recommendations of other agencies involved in granting a permit to fill wetlands, in particular, the Pennsylvania Fish Commission, the Environmental Protection Agency, and the U.S. Fish and Wildlife Service. The record reveals that all of these agencies recommended denial of the Mocks' project as proposed.

The Mocks, through their engineering consultant Russell Benner, responded to the department's preliminary review in a letter dated September 30, 1988, in which he suggested moving the location of the building, offered to maintain a buffer between the project and the wetlands through a conservation easement and by planting trees, and noted that the Mocks' plan provided for a wetland replacement area of .38 acres to compensate for the proposed filling of .87 acres. Mr. Benner also noted that he considered the application complete at that time, and that all matters had been adequately dis-

cussed. His letter to the department stated, "[w]e will not accept the permit application being deemed incomplete in lieu of taking action on the permit request, therefore we hope that future correspondence from your office will address a conditional approval of, or a denial of the permit application."

In October 1988 the department contacted Mr. Benner to suggest that the Mocks consider limiting their construction to the uplands portion of their property. Mr. Benner responded that this proposal would require the Mocks to secure a variance from the township's setback requirements,[4] and that he would pursue that alternative. The Mocks did not submit any alternative proposals to the department.

Thereafter, the department completed its review of the Mocks' application. In a letter dated April 12, 1990, the department notified the Mocks that their application was denied. The reasons for the denial were similar to the ones the department gave in its preliminary review, namely, that the project adversely affected wetlands and wetland ecology, that the Mocks did not demonstrate that alternatives with less impact on wetlands did not exist to attain the goals of the project, and that the public benefits of the project did not outweigh the environmental harms.

The Mocks appealed the denial to the Environmental Hearing Board, arguing that the department erred in denying their permit, and that the department's action constituted a taking of their property. Before the board ruled, the department and the Mocks met to discuss possibilities for settlement. In the course of that meeting the department again suggested that the Mocks consider using only the upland portions of the property for their shop, but the Mocks rejected that idea as economically infeasible. The department also suggested using the property for a wetlands nursery, but the Mocks rejected that idea as well.

After two days of hearings, in which it took additional evidence, the board upheld the department's denial in a decision issued on May 1, 1992. After concluding that it had

---

4. Section 1402b of the Ordinance specifies the minimum setback requirements for permitted uses in the C–2 District.

jurisdiction over the Mocks' appeal, the board ruled that the department correctly denied the project permit and that the denial did not constitute a taking. From the board's ruling that the department's action did not effect an unconstitutional taking, the Mocks appeal to this court.

## THE ENVIRONMENTAL HEARING BOARD'S DECISION

The board's decision consisted of extensive findings of fact, discussion, and conclusions of law. Some of the facts were stipulated by the parties, describing the parcel, the project, and an earlier unsuccessful attempt by the Midas Realty Corporation to secure permission to fill wetlands on the Mocks' property to build a muffler repair shop.[5]

Based on the amount quoted in the Midas deal, Finding of Fact No. 54, which is important to deciding the takings question, states, "[t]he Site in its present condition and without a permit to fill in a portion of the wetlands is essentially valueless. With a permit similar to that applied for by Appellants [the Mocks], the Site could have a value of $175,000 (the amount offered by Midas) or more...."

The board's discussion outlined the review procedures that the department followed in evaluating the Mocks' project.[6] As already stated, of the ten factors to be considered in evaluating projects which interfere with wetlands, the department found two to be relevant—the impact of the proposed project on the ecology of the wetlands, and the extent to which the project was water-dependent. 25 Pa.Code §§ 105.15(b)(4) and

---

**5.** In 1985 the Mocks entered into an Agreement of Sale with Midas Realty Corporation for $175,000, which was contingent upon Midas' ability to secure all the permits necessary to build a muffler repair shop on the property. When Midas encountered opposition to the project from the department and the Army Corps of Engineers in 1986, it abandoned the project. The design of the Mocks' project was "basically the same as the design of the Midas project." Finding of Fact No. 25.

**6.** The board noted, and we note also, that Chapter 105 of 25 Pa.Code was substantially revised effective October 12, 1991. The references in the board's decision, and in ours, are to the version of the regulations in effect on April 12, 1990, when the department denied the Mocks' permit.

(b)(7). Because the department found that the project had the potential for significant environmental harm, the department then proceeded to consult with the Mocks to examine ways to reduce or eliminate the harm, pursuant to 25 Pa.Code § 105.-16(a), including ways to mitigate the harm.

The department defines mitigation in 25 Pa.Code § 105.1 as follows:

An action undertaken to accomplish one or more of the following purposes:

(i) Minimize impacts by limiting the degree or magnitude of the action and its implementation.

(ii) Rectify the impact by repairing, rehabilitating or restoring the impacted environment.

(iii) Reduce or eliminate the impact over time by preservation and maintenance operations during the life of the action.

(iv) If the results listed in subparagraphs (i)–(iii) of this definition cannot be achieved, compensate for the impact by replacing or providing substitute resources or environments.

In this case the department considered the Mocks' efforts to mitigate the environmental harm and concluded that, although they attempted to reduce the negative impact over time by proposing deed restrictions and a tree buffer under factor (iii), the Mocks did not adequately avoid or minimize the negative impact by considering reducing the size of the project or changing its proposed use, under factor (i). The department did not find factor (ii) applicable to the Mocks' proposal.

Further, the department continued its analysis of the Mocks' proposal to include replacement wetlands as a part of their project, according to factor (iv). The department concluded, and the board agreed, that the Mocks' creation of .38 acres of replacement wetlands did not compensate for the environmental harm caused by the loss of .87 acres of wetlands, as proposed.

The department then proceeded to the third step in its evaluation, as required by 25 Pa.Code § 105.16, to weigh the public benefits against the environmental harm of the project.

Of the possible benefits listed in that section of the regulations, the Mocks identified five positive effects of their project: reduction of illegal trash dumping from the roadway; elimination of erosion and sediment pollution; reduction of air pollution resulting from auto repairs; the creation of 20–30 jobs; and fulfilling a need for general auto repairs in the area.

The department ruled, and the board agreed, that the Mocks did not prove that the benefits outweighed the harms. The reduction of trash and erosion could be accomplished with minor measures if they were proven to be problematic. The other three benefits—reducing air pollution, creating jobs, and satisfying demand—were all associated with the shop itself, but were not shown to be tied in any way to the shop's location on the Mocks' land, near or on wetlands. The Mocks do not question the department's balancing of harms and benefits here on appeal.

After determining that it had jurisdiction,[7] the board concluded that the Mocks did not suffer an unconstitutional taking because the Mocks did not prove that their land was valueless after the department's permit denial. Relying on *Andrus v. Allard*, 444 U.S. 51, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979), and *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), among others, the board ruled that although the department's action may prevent the Mocks from the most profitable use of their property, reduction in value is not enough to find a taking. Based on the fact that the Mocks did not consider any alternative projects or submit revised applications to the department, the board stated, "[s]ince Appellants [the Mocks] did not seek approval for a smaller facility, we cannot conclude that they will be denied any use of the wetlands." Further, the board stated that, "[c]ommon sense tells us that some of the other permitted uses do not require a 5,000 square foot building and may not require as many parking spaces."

7. The department had argued that the board lacked jurisdiction to consider the takings question, but revised its position on appeal to this court, stating that the board correctly determined that it had jurisdiction.

The board was persuaded that the Mocks' investment-backed expectations were not destroyed, because they never introduced evidence of what their expectations were when they purchased the property in 1963 or afterwards, and because riparian land has been "the subject of regulation for centuries," citing *White v. Pennsylvania Railroad Co.*, 354 Pa. 397, 47 A.2d 200 (1946). The board perceived no evidence to suggest that, just because the department denied the fill permit for this particular project, it would prohibit all projects which required any filling of wetlands; thus, in the board's view, the Mocks' investment-backed expectations were not destroyed.

Within the legal framework of traditional takings analysis, the board concluded that the department's action was not an unconstitutional taking of the Mocks' property. After the board rendered its decision, the U.S. Supreme Court decided the *Lucas* case, on which the Mocks rely heavily to support their argument that because the department's action left their property valueless, the board erred in not finding a taking.

■ Our scope of review in Environmental Hearing Board decisions is to determine whether the record contains substantial evidence to support the board's findings of fact, and whether the board committed errors of law or constitutional violations. *Willowbrook Mining Co. v. Department of Environmental Resources*, 92 Pa.Commonwealth Ct. 163, 499 A.2d 2 (1985).

## THE LUCAS DECISION

■ In *Lucas*, decided on June 29, 1992, the U.S. Supreme Court considered the appeal of an owner of beachfront property in South Carolina, who was prohibited from developing any permanent habitable structures on his land by the 1988 South Carolina Beachfront Management Act, enacted after Mr. Lucas had purchased the property. S.C.Code §§ 48–39–250— 290 (Supp.1990). The Beachfront Management Act directed the South Carolina Coastal Council to establish a baseline beyond which construction of habitable improvements was prohibited, for the purpose of preserving the state's beaches.

No exceptions were provided in the Beachfront Management Act.[8]

After first deciding that the claim was ripe, Justice Scalia outlined the two categories of regulatory actions which would be compensable without the "case-specific inquiry into the public interest advanced in support of the restraint" that would normally be required in a traditional takings analysis. *Lucas*, —— U.S. at ——, 112 S.Ct. at 2893. The first type involves regulations which compel a property owner to allow a physical invasion of his property. *Id.* at ——, 112 S.Ct. at 2893. "The second situation in which we have found categorical treatment appropriate is where regulation denies all economically beneficial or productive use of land." *Id.* at ——, 112 S.Ct. at 2893.

Justice Scalia distinguished between government regulation that diminishes property values and the "extraordinary circumstance when *no* productive or economically beneficial use of land is permitted . . . ." *Id.* at ——, 112 S.Ct. at 2894 (emphasis in original). He stated:

> And the *functional* basis for permitting the government, by regulation, to affect property values without compensation— that 'Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law,' . . .—does not apply to the relatively rare situations where the government has deprived a landowner of all economically beneficial uses.

*Id.* at ——, 112 S.Ct. at 2984 (emphasis in original and citations omitted) (quoting *Pennsylvania Coal v. Mahon*, 260 U.S. 393, 413, 43 S.Ct. 158, 159, 67 L.Ed. 322 (1922)).

Justice Scalia would require compensation in situations where "the owner of real property has been called upon to sacrifice *all* economically beneficial uses in the name of the

---

8. S.C.Code §§ 48–39–280(A) and 290(A) (Supp.1988). In the course of Mr. Lucas' appeal, the South Carolina legislature amended the Beachfront Management Act to allow the Council to issue special construction permits in certain circumstances. S.C.Code § 48–39–290(D)(1) (Supp. 1991).

common good, that is, to leave his property economically idle ...," *id.* at ——, 112 S.Ct. at 2895 (emphasis in original), typically, as in Mr. Lucas' case, requiring land to be left in its natural state. The Court accepted the trial court's finding that Mr. Lucas' land was rendered valueless by the South Carolina law, fitting this case into the second category of takings cases described by Justice Scalia.

The Court in *Lucas* then defined circumstances where the government could avoid compensating a land owner in a categorical taking, even where the land was deprived of all value, if the regulation in question does no more than could be accomplished under the state's nuisance laws. "Any limitation so severe cannot be newly legislated or decreed (without compensation), but must inhere ... in the restrictions that background principles of the State's law of property and nuisance already place upon land ownership." *Id.* at ——, 112 S.Ct. at 2900. Because the question of whether Mr. Lucas could have been prohibited from developing his land under existing nuisance law was not addressed below, the Supreme Court remanded the case to the South Carolina Supreme Court for consideration of that issue.

The Mocks argue that *Lucas* applies to their situation, and that the board's own findings support the conclusion that the department's action constituted a taking. First, they note that the board found that their property, in its present condition and without a permit, is essentially valueless. Finding of Fact No. 54. Second, they argue that each of the alternatives suggested by the department, namely, using the site as a wetlands nursery, and confining development to the upland areas, were economically infeasible, and the board recognized them as unreasonable options. Third, the Mocks argue that the department never substantiated that it would grant a permit to fill any portion of the wetlands. We will address their arguments in turn.

Although we find substantial evidence to support the board's finding that the Mocks' property is valueless in its present condition, that finding does not put the Mocks in the same situation as the land owner in *Lucas.* The state statute

in *Lucas* prohibited all permanent development on the property in question, but the department's action with respect to the Mocks only denied the specific project under consideration. In this case, neither the Act nor the department's regulations prohibit the filling of wetlands, nor did the department's permit denial prohibit all construction on the Mocks' land.

The import of the board's finding, that the land in its current state is valueless, is simply to state that the Mocks' undeveloped property at present is without economic value. That finding does not mean that the Mocks' property must remain undeveloped and devoid of value in the future because of the department's environmental regulations.

In its discussion, the board accepted as reasonable the Mocks' rejection of the department's suggestion to build their shop in the southeast uplands corner of the lot, because it was objectionable from a business standpoint. According to the Mocks, if the shop was located in that corner of the lot, it would have low visibility from the highway, would be close to noise and dust from a neighboring cement plant, and would require construction of a bridge or access road to reach it, which would also require filling of wetlands.[9]

We agree with the board's determination that the proposed alternative location for the garage may be unreasonable from a business standpoint, but, again, the department's denial of this project does not foreclose other uses of the property. As the board points out, there are a variety of uses permitted in this C–2 Highway Commercial District, which may not require filling of wetlands in the same amount or location as the plan submitted by the Mocks. Section 1401a of the Ordinance permits a variety of uses in the C–2 district, including museums, libraries, hospitals, nursing homes, medical and other office buildings, recreational and municipal facilities, service and retail shops, and restaurants. The Mocks have not established the impossibility of using the property for service or retail shops, for example.

9. The wetland nursery option was never fully explored by the department or the board, because it "did not make sense" to the Mocks. Finding of Fact No. 49.

The Mocks next argue that the department never guaranteed that it would approve a permit to fill wetlands for an access road to reach the garage if it was moved to the uplands corner, or for any other purpose, but the record does not support this contention. Because the Mocks never submitted alternative proposals to the department, the department could only respond to questions about hypothetical situations. However, when questioned about the possibility of granting a permit to fill wetlands for an access road to reach the southeast uplands corner, Richard Shannon, a water pollution biologist for the department, testified, "I feel that a driveway construction on this property would be feasible because the impact would be minimal."

The board correctly states that the department's "action was to deny permission for Appellants [the Mocks] to proceed with a specific project design. It does not go beyond that point." Although the board did not consider *Lucas* in its evaluation, the facts and conclusions the board did make in upholding the department's action support our interpretation that the Mocks' case is distinguishable from *Lucas*. Because we find *Lucas* to be inapplicable to this case, we need not consider whether the Mocks' project would have already been prohibited under existing nuisance or property law.

## TRADITIONAL TAKINGS ANALYSIS

Although we have determined that the Mocks' case is not the extraordinary one when no economically beneficial use of land is permitted, *Lucas*, —— U.S. at ——, 112 S.Ct. at 2894, we must still evaluate their situation under the principles of takings analysis established by previous court decisions. Both the Fifth Amendment to the U.S. Constitution, and Article I, section 10 of the Pennsylvania Constitution provide that private property shall not be taken for public use without just compensation.[10]

10. U.S. Const. amend. V, and Pa. Const. art. I, § 10. Because the courts of our commonwealth have interpreted the takings clause using the same framework as the federal courts, we need not pursue two separate levels of analysis here.

The Act and the department's regulations are exercises of the state's police power, to enact and enforce laws for the promotion of the public welfare. *Willowbrook Mining Co.*, 92 Pa.Commonwealth Ct. at 169, 499 A.2d at 5. In *Lawton v. Steele*, 152 U.S. 133, 14 S.Ct. 499, 38 L.Ed. 385 (1894), the U.S. Supreme Court provided a three-part test for the validity of a state's actions under its police power: (1) The public interest must require such interference; (2) The means chosen must be reasonably necessary for the accomplishment of the purpose; and (3) The means chosen must not be unduly oppressive on individuals. *Id.* at 137, 14 S.Ct. at 501.

As the board noted in its decision, the Mocks concede that the department's action satisfies the first two prongs of *Lawton*. The Mocks never argued that the purpose of the Act was invalid, or that the Act and its implementing regulations were not tailored to meet a legitimate state purpose.[11] The Mocks argue that the permit denial places an undue burden on them as individual property owners, according to the third prong of *Lawton*. Our court recognized that "an unconstitutional taking of private property would be unduly oppressive." *Willowbrook Mining Co.*, 92 Pa.Commonwealth Ct. at 170, 499 A.2d at 5.

Before the Supreme Court's decision in *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922), the concept of a taking was generally limited to a direct physical appropriation of private property or the functional equivalent of such an ouster. *Lucas*, —— U.S. at ——, 112 S.Ct. at 2892. In *Mahon*, Justice Holmes recognized the potential for a taking to occur through the operation of government regulation. He stated, "[t]he general rule at least is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Mahon*, 260 U.S. at 415, 43 S.Ct. at 160.

11. Section 693.2 of the Act, 32 P.S. § 693.2, states the purposes of the Act, which are to regulate and plan dams and other water encroachments in order to protect the health, safety, and welfare of people and property, to protect the state's natural resources, and to protect navigation.

Since that time, the United States Supreme Court has not decided the point at which a regulation goes too far according to any set formula, but has been guided by the facts and circumstances in each case. *Penn Central Transportation Co.*, 438 U.S. at 124, 98 S.Ct. at 2659. In general, compensation for a government taking will be required when "the purpose of the regulation or the extent to which it deprives the owner of the economic use of the property suggest that the regulation has unfairly singled out the property owner to bear a burden that should be borne by the public as a whole." *Yee v. City of Escondido,* —— U.S. ——, ——, 112 S.Ct. 1522, 1526, 118 L.Ed.2d 153 (1992).

■ In its case-by-case, factual inquiries, the Supreme Court has identified several important factors in determining whether a regulatory taking has occurred: the type of governmental interference; the diminution of property values; and the extent to which the regulation interferes with reasonable, distinct, investment-backed expectations. *Penn Central Transportation Co.*, 438 U.S. at 124, 98 S.Ct. at 2659. We will analyze each of these factors as it relates to the Mocks' circumstances.

■ First, the courts have been more likely to find a taking if a regulation compels a property owner to allow a physical invasion of his property, rather than interference with its use. *Id.* at 124, 98 S.Ct. at 2659. Even a minimal permanent intrusion on private property has been considered a taking, as in *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982), where the Court found a regulatory taking when property owners were required to allow cable television equipment to be attached to their buildings. Because the regulation in the Mocks' case does not involve a physical interference with property, this factor does not persuade us to conclude that a taking has occurred.

When a regulation interferes with the use of property, its effect on property values is an important consideration in our analysis. Because government would cease to function if the

state was compelled to compensate property owners every time a regulation diminished property value, the courts have uniformly held that diminution in property value, standing alone, cannot establish a taking; the takings issue must be resolved by focusing on the uses that the regulations permit. *Penn Central Transportation Co.*, 438 U.S. at 131, 98 S.Ct. at 2663.[12]

Further, a regulation does not effect a taking just because it deprives a property owner of the most valuable use of his property. *Andrus*, 444 U.S. 51, 100 S.Ct. 318.[13] Where an owner possesses a "full 'bundle' of property rights, the destruction of one 'strand' of the bundle is not a taking" because the effect of the regulation must be viewed in its entirety. *Andrus*, 444 U.S. at 66, 100 S.Ct. at 327. In applying these principles, the Supreme Court has sustained regulations that have resulted in large reductions in property value where the land retains significant value. *Pace Resources, Inc. v. Shrewsbury Township*, 808 F.2d 1023, 1031 (3d Cir.1987) (citing *e.g.*, *Euclid* and *Hadacheck*).

The Mocks did not present any evidence of the diminution in their property value, except to quote the amount involved in their earlier sales agreement with Midas to build a muffler shop, which fell through, and to submit a narrative appraisal report which supported that estimate. Because the Mocks focused on only two options for their land, building an auto repair shop according to their specific site plan or leaving the land undeveloped, they did not offer any testimony or evidence about the economic value of their land which could be realized through other development options.

Therefore, although we accept the board's finding that the land in its present state is essentially valueless, the Mocks failed to prove that their land lost all of its residual value when the department denied their fill permit. The Act does not

12. *See also Euclid v. Ambler Realty Co.*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926), and *Hadacheck v. Sebastian*, 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915).

13. *See also Goldblatt v. Hempstead*, 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962).

compel the Mocks to leave their land in its present undeveloped state, and we must focus on the remaining uses which the regulations permit. Because there is no evidence in the record that the land cannot be put to economically viable use, this factor also weighs against finding a taking.

The third factor in our analysis involves the effect of the department's action on the Mocks' reasonable, distinct, investment-backed expectations for their property. As stated in *Pace Resources, Inc.*, "[t]he concept of reasonable, distinct, investment-backed expectations may . . . involve a recognition of the fact that a property can have value, arising from partially executed plans for development, that is unique to its owner and not reflected in its current market value." 808 F.2d at 1032–33. However, the expectations are reasonable only if they take into account the power of the state to regulate property for the public interest, and, for a taking to occur, the regulation must have almost the same effect as the destruction of the owner's property rights. *Id.* at 1033.

We find substantial support for the board's finding that the Mocks never presented any evidence of what their plans were for their property when they bought it in 1963. The department's permit denial did not interfere with any present or past use of the property, so we must focus on what the Mocks could reasonably expect to do with their property in the future. *See Penn Central Transportation Co.*, 438 U.S. at 136, 98 S.Ct. at 2665.

As to the Mocks' future plans, we further agree with the board that the Mocks could not reasonably expect to develop their land free from government regulation because it is riparian land, which has been subject to regulation for centuries. *White v. Pennsylvania Railroad Co.* Not only is a large part of their parcel wetlands, which the Mocks do not contest, but it is also within the 100–year floodplain, as designated by the local zoning ordinance.

The department's action prevents the Mocks from proceeding with the development of their auto repair shop as planned, but it does not destroy the Mocks' rights to develop their property according to some alternative plan, even if that plan

involves some filling of wetlands. Thus, the Mocks' reasonable investment-backed expectations were not frustrated to the point of effecting a taking of their property.

The Mocks rely on two decisions of the U.S. Claims Court to support their takings argument, *Loveladies Harbor, Inc. v. United States,* 21 Cl.Ct. 153 (1990), and *Formanek v. United States,* 26 Cl.Ct. 332 (1992), but we are not bound or persuaded by these decisions. In each of these cases the landowners appealed from the Army Corps of Engineers' denial of a permit to fill wetlands, and in each instance the U.S. Claims Court found that a taking had occurred.

In *Loveladies Harbor, Inc.* the court determined that a taking occurred because of the significant diminution in property value, based on a comparison of the estimated fair market value of the land if it was fully developed for its most profitable use, to the value of the land sitting idle, which was almost zero. The court was not persuaded that the alternative uses suggested by the government had a "reasonable probability" of being successfully developed. *Loveladies Harbor, Inc.,* 21 Cl.Ct. at 159. Furthermore, the court found that the federal and state regulations in question lacked a substantial, legitimate state purpose. *Id.* at 160.

In *Formanek* the court followed the same reasoning as it did in *Loveladies,* to find that the permit denial effected a taking when the property value of the undeveloped land was substantially lower than its projected worth when fully developed. *Formanek,* 26 Cl.Ct. at 339–40. The court also found that the land owners' investment-backed expectations in their property had been frustrated by the denial. *Id.* at 340.

These cases are distinguishable from the Mocks' situation on several grounds. The method of comparing the fair market value of the most profitable use of the property to its market value as a completely undeveloped tract, used in *Loveladies* and *Formanek,* has not been adopted by the United States Supreme Court, and we decline to adopt it here. Because the past decisions of the Supreme Court clearly support the principle that a regulation does not effect a taking when it prevents a property owner from using his land in such a way

as to generate the most profit, *e.g., Andrus,* we are convinced that the method used by the Claims Court to calculate diminution in property value is in error.

Furthermore, the Mocks did not argue that the Act here lacked a legitimate public purpose, nor did they prove that their reasonable, investment-backed expectations were destroyed by the department's action, factors which were apparently present in the Claims Court's analysis in *Loveladies* and *Formanek,* respectively. Therefore, although the cases cited by the Mocks involved regulation of wetlands which did go so far as to accomplish a taking, they do not change the outcome of the case before us.

## CONCLUSION

Because the department's denial of the Mocks' permit did not render the land valueless, this case does not fit the categorical rule articulated in *Lucas v. South Carolina Coastal Council.* Nor does this case satisfy any of the factors present in a traditional takings analysis, such that the state is forcing the Mocks alone to bear burdens which, in all justice and fairness, should be borne by the public as a whole. *Penn Central Transportation Co.,* 438 U.S. at 123, 98 S.Ct. at 2659. The department's actions here did not effect a taking of the Mocks' property for which compensation is required.

Accordingly, we affirm the board's decision.

## *ORDER*

NOW, March 25, 1993, the decision of the Pennsylvania Environmental Hearing Board, dated May 1, 1992, at EHB Docket No. 90–166–MR, is affirmed.

KELLEY, Judge, dissenting.

I respectfully dissent. I believe that the record and exhibits indicate clearly that the Mock property was rendered economically valueless by the denial of the permit by the Department of Environmental Resources.

The site of the property is in a commercial district fronting on a main traffic artery in Bucks County. The exhibits and testimony indicate that there was no feasible way that the property could be developed without encroaching on the wetlands. The Department of Environmental Resources determined preservation of the wetlands as justification for the denial of the permit for construction of commercial utilization of the property.

I believe therefore, that the facts of the instant case do fall within the parameters as determined by *Lucas v. South Carolina Coastal Council,* —— U.S. ——, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992).

I additionally find it most troubling that the Department of Environmental Resources relies upon an evaluation by the Fish Commission for its determinations. The Fish Commission language "would seem likely" as being sufficient justification to justify a negative determination is incomprehensible to me. (*See* Department of Environmental Resources Exhibit No. 27.) Such equivocal language would not support any rightful claims in law in order to sufficiently justify impeding the substantive rights of property.

I would, therefore, find sufficiency in the record that there was a taking by this determination and would accordingly so reverse.